David J. KEEGAN; Luis Garcia, Betty Kolstad; Carol Hinkle; Eric Ellis; Charles Wright; Jonathan Zdeb; individually and behalf of all others similarly situated, Plaintiff,

v.

AMERICAN HONDA MOTOR CO, INC.; Honda of America Manufacturing, Inc., Defendant.

Case No. CV 10–09508 MMM (AJWx).

United States District Court, C.D. California.

Jan. 6, 2012.

Cory S. Fein, Cynthia B. Chapman, Michael A. Caddell, Caddell and Chapman, Houston, TX, Matthew Mendelsohn, Mazie Slater Katz & Freeman LLC, Roseland, NJ, Payam Shahian, Ramtin Shahian, Strategic Legal Practices APC, Los Angeles, CA, Robert L. Starr, Law Office of Robert L. Starr, Woodland Hills, CA, for Plaintiff.

Alexa C. Warner, David Johnson, Eric S. Mattson, Michael C. Andolina, Sidley Austin LLP, Chicago, IL, Eric Y. Kizirian,

Roy M. Brisbois, Lewis Brisbois Bisgaard and Smith LLP, Los Angeles, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

MARGARET M. MORROW, District Judge.

On December 10, 2010, plaintiffs David J. Keegan, Luis Garcia, Betty Kolstad, Carol Hinkle, Eric Ellis, Charles Wright, and Jonathan Zdeb filed this putative class action against American Honda Motor Co., Inc., and Honda of America Manufacturing, Inc., alleging claims under the California Consumer Legal Remedies Act ("CLRA"), the California Unfair Competition Law ("UCL"), the Song–Beverly Act, the Magnuson–Moss Warranty Act, California Commercial Code Section 2313, and various states' consumer protection and implied warranty statutes.[1] On May 23, 2011, plaintiffs filed a first amended complaint.[2] Defendants filed a motion to dismiss, which plaintiffs opposed.[3] The parties have also filed various requests for judicial notice in support of their briefs.[4]

1. Complaint, Docket No. 1 (Dec. 10, 2010). The complaint initially alleged claims against Honda North America, Inc., Honda Motor Company, Ltd., Honda Manufacturing of Alabama LLC, and Honda Engineering North America, Inc. The first two defendants were dismissed pursuant to a stipulation of the parties. (Order Dismissing Defendants Honda Motor Co., Ltd. and Honda North America, Inc. Without Prejudice, Docket No. 56 (Jul. 20, 2011)). The last two were terminated from the action because they were not named in the first amended complaint.

2. First Amended Complaint ("FAC"), Docket No. 39 (May 23, 2011).

3. Motion to Dismiss First Amended Complaint ("MTD"), Docket No. 45 (Jun. 20, 2011); Opposition to Motion to Dismiss the First Amended Complaint ("Opp."), Docket

## I. FACTUAL BACKGROUND

### A. The Complaint's Allegations

Plaintiffs bring this action on behalf of all individuals who purchased or leased certain allegedly defective model year 2006 and 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicles (collectively, the "class vehicles") that were designed, manufactured, distributed, marketed, sold, and leased by defendants.[5] Plaintiffs allege that the class vehicles and in particular, their rear suspension, are defective.[6] Specifically, plaintiffs allege that the rear control arm originally installed in the vehicles was too short.[7] This purported defect affects the alignment and geometry of the rear suspension, causing the vehicles to become misaligned. this in turn results in uneven and premature wear on the rear tires.[8] The misalignment also causes "occupants to experience an extremely rough ride, as well as exceptionally loud and disruptive noise, while driving the class vehicles."[9]

Plaintiffs allege that Honda learned of the suspension defect through pre-release testing data, early consumer complaints to Honda and its dealers, testing conducted

No. 58 (Aug. 12, 2011); Reply in Further Support of Its Motion to Dismiss ("Reply"), Docket No. 67 (Sept. 2, 2011).

4. Request for Judicial Notice re: Motion to Dismiss ("Honda RJN"), Docket No. 46 (Jun. 20, 2011); Request for Judicial Notice re: Opposition to Motion to Dismiss ("Plaintiffs' RJN"), Docket No. 59 (Aug. 12, 2011); Second Request for Judicial Notice ("Second Honda RJN"), Docket No. 68 (Sept. 2, 2011).

5. FAC, ¶ 1, 94–97.

6. *Id.*, ¶ 103.

7. *Id.*, ¶ 10.

8. *Id.*, ¶ 104.

9. *Id.*

in response to the complaints, and "other internal sources." [10] Plaintiffs contend that Honda "actively concealed" the defect from its customers,[11] but had a duty to disclose because the defect poses an "unreasonable safety hazard," and it had "exclusive knowledge or access to material facts" about the vehicles and the rear suspension problem that were unknown and not reasonably discoverable by plaintiffs.[12]

Plaintiffs contend that the defect creates a safety hazard because a driver has only three means of controlling a car—braking, accelerating, or steering. Each is dependent on rolling friction with the ground beneath the wheels, and the only contact the vehicle has with the ground is through its tires.[13] The defect allegedly causes uneven tread wear on the tires, which can result in "catastrophic" tire failure because one side of the tire receives more pressure than the other.[14] The defect thus can "suddenly and unexpectedly cause tire failure while the vehicle is in operation," which can lead to car accidents, personal injury, or death.[15]

The cost of repairing the defect and replacing the worn tires allegedly can run "hundreds, if not thousands, of dollars." [16]

The defect also purportedly requires that tires be replaced prematurely, sometimes after less than 20,000 miles.[17] Plaintiffs assert that the expected tread wear of properly functioning tires in the class vehicles is approximately 75,000 or more.[18]

Plaintiffs contend that "hundreds, if not thousands," of purchasers and lessees of class vehicles have experienced the defect, filed complaints with the NHTSA, and posted information about the problem on the internet.[19] They maintain that although Honda knew of the problems, it took no steps to notify customers of the defect or provide relief until January 2008, two years after the class vehicles had been placed on the market.[20] At that point, Honda issued a technical service bulletin ("TSB") to its dealers and began covering "certain costs associated with temporary correction" of the defect, such as replacing the rear control arm. It also provided reimbursement for prematurely worn tires.[21] By the time Honda took these steps, however, many of the vehicles had already been sold or leased, and class members had replaced worn tires "without adequate reimbursement." [22] Plaintiffs allege that, although the TSB purportedly did not reference certain class vehicles, the

10. *Id.,* ¶ 105.

11. *Id.*

12. *Id.,* ¶ 106.

13. *Id.,* ¶ 5.

14. *Id.,* ¶ 6.

15. *Id.* The complaint asserts that because of the defect, the tires on Class Vehicles do not comply with federal motor vehicle safety standards ("FMVSS"), which set tire dimensions and lab test requirements for passenger vehicle tires. Because the defect causes unevenness along the width of the tire, a tire wear gauge will not accurately reflect the extent of the wear. (*Id.,* n. 3.)

16. *Id.,* ¶ 7.

17. *Id.*

18. *Id.*

19. *Id.,* ¶ 107. This paragraph quotes a number of the consumer complaints filed with the National Highway Traffic Safety Administration and posted on the internet. The consumer complaints report a range of problems associated with the vehicles' rear control arms, which caused significant tire wear beyond that typically expected given the cars' mileage.

20. *Id.,* ¶ 108.

21. *Id.*

22. *Id.*

defects it noted are found in all class vehicles.[23]

The TSB stated that the too-short rear control arms should be replaced with longer control arms.[24] Plaintiffs assert that the recommended modification is "only a temporary fix" that does not address the underlying problem. They contend that consumers whose vehicles are modified will experience suspension defects in the future, which will require costly repairs, and give rise to safety hazards.[25] Plaintiffs allege that defendants know the recommended modification does not fix the defect and that it will only "prolong the amount of time that will elapse" before the defect manifests again.[26] They contend the delay is designed to ensure that the defect occurs outside the warranty period, shifting financial responsibility for the defect to class members.[27]

Although the TSB appears to concern vehicles still under warranty, plaintiffs assert that in practice, it is limited to the "most persistent customers ... who visit Honda's dealers and complain loudly enough about the Suspension Defect and the premature tire wear it causes."[28] They contend that Honda's dealers fail to advise consumers about the cause of the tire wear they are experiencing and about the TSB. Despite knowing of the defect since 2006, and of the proposed fix for it since 2008, dealers purportedly attribute the tire wear to consumers' "driving habits, road conditions, and improper mainte-

nance."[29] Honda has not issued a recall for the vehicles, offered reimbursement for costs incurred, or provided replacement or repairs.[30]

### B. The Plaintiffs

The complaint was filed on behalf of seven named plaintiffs located in six different states. Although plaintiffs' specific interactions with Honda regarding the alleged defect, and the severity of the defect they have experienced, vary, each purchased a Honda Civic from a Honda dealer and complained about premature wear of the tires. The plaintiffs are:

- David J. Keegan, a California citizen and resident of Dublin, who purchased a new 2007 Honda Civic from Dublin Honda in April 2007;[31]

- Luis Garcia, a New York citizen, who purchased a new 2007 Honda Civic EX on March 17, 2007;[32]

- Eric Ellis, a resident of Adrian, Oregon, who purchased a new 2007 Honda Civic LX from Tom Scott Honda in Nampa, Idaho on July 6, 2007;[33]

- Charles Wright, a citizen of Montana and resident of Missoula, who purchased a Honda Civic Hybrid from University Motors in Missoula on March 3, 2006;[34]

- Betty Kolstad, a citizen of California and resident of Big Ben, California, who purchased a 2006 Honda Civic from Auto West Honda in Roseville, California on October 15, 2009, with a certified pre-owned car warranty for 60 days.[35]

---

23. *Id.,* ¶¶ 9, 108.

24. *Id.,* ¶ 10.

25. *Id.,* ¶ 11.

26. *Id.,* ¶ 12.

27. *Id.*

28. *Id.,* ¶ 13.

29. *Id.,* ¶ 15.

30. *Id.* ¶ 16.

31. *Id.* ¶ 19.

32. *Id.* ¶ 22.

33. *Id.* ¶ 40.

34. *Id.* ¶ 44.

35. *Id.* ¶ 60.

- Carol Hinkle, a citizen of North Carolina and resident of Salisbury, who purchased a Honda Civic LX at Salisbury Honda in April 2008; [36]
- Jonathan Zdeb, a resident of West Palm Beach, Florida, who purchased a new 2007 Honda Civic SI from Holman Honda in Fort Lauderdale, Florida in January 2007. [37]

## II. DISCUSSION

### A. Legal Standard Governing Motions to Dismiss Under 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995).

The court need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); see also *Twombly*, 550 U.S. at 545, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ). [38]

**36.** *Id.* ¶ 68.

**37.** *Id.*, ¶ 82.

**38.** The parties submitted various requests for judicial notice in support of or opposition to the motion. Defendants' first request seeks judicial notice of (1) Technical Service Bulletin 08–001, (2) the warranty for the 2006 Honda Civic, and (3) the warranty for the 2007 Honda Civic. (Honda RJN, Exh. 1 ("TSB"), Exh. 2 ("2006 Honda Civic Warranty"), Exh. 3 ("2007 Honda Civic Warranty").) The complaint references each of these documents, and the court can consider them under the "incorporation by reference" doctrine as a result. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001) ("If the documents are not physically attached to the complaint, they may be considered if the documents' 'authenticity . . . is not contested' and 'the plaintiff's complaint necessarily relies' on them," quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir.1998)); *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 986 (9th Cir.1999) ("[The incorporation by reference doctrine] permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading,'" quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994), cert. denied, 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994), over-

## B. The Heightened Pleading Requirements of Rule 9(b)

■ The parties agree that plaintiffs' UCL and CLRA claims sound in fraud, and are therefore subject to the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure. See *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir.2009) ("[W]e have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for violations of the CLRA and UCL.... [Where] the claim is ... 'grounded in fraud' or ... 'sound[s] in fraud,' ... the pleading ... as a whole must satisfy the particularity requirement of Rule 9(b)." quoting *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir.2003) ("In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule· 9(b)")); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404–05 (9th Cir.1996) ("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under Section 11 [of the 1933 Securities Act] when, as here, they are grounded in fraud").

Rule 9(b)·requires that the facts constituting the fraud be pled with specificity. Conclusory allegations are insufficient. FED. R. CIV. PROC. 9(b); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir.1989) ("A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer to the allegations. While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allega-

ruled on other grounds, *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.2002)).

The court considers only the existence and contents of the documents, not the truth of information contained in them. See *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents ..."); *In re Foundry Networks, Inc.*, C 00–4823 MMC, 2003 WL 23211577, *10 n. 11 (N.D.Cal. Feb. 14, 2003) ("Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents. Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents").

In their other requests, plaintiffs and defendant seek judicial notice of filings in other cases that involved alleged safety defects in automobiles. Specifically, defendant requests that the court take judicial notice of four class action complaints filed by plaintiffs' counsel against car manufacturers. (Second Honda RJN.) Defendants assert that the documents demonstrate that the complaint contains boilerplate allegations lacking the specificity required to survive a motion to dismiss. Plaintiff, for his part, asks that the court take judicial notice of various documents, including court filings, in two other cases, which purportedly show that allegations similar to those made in this action have been deemed sufficient. (Plaintiffs' RJN, Exhs. 5, 6.) Plaintiffs also seek judicial notice of a Honda service bulletin and warranty extension related to a mechanical defect in 2006 to 2008 Honda Civics that is not at issue here. (*Id.*, Exhs. 1, 2.) The court questions the relevance of these documents and the propriety of relying on them in deciding the motion to dismiss. As a consequence, it declines to consider them, and does not rule on the parties' requests for judicial notice.

tions of fraud are insufficient"). See also *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir.1973) (concluding that allegations stating the time, place, and nature of allegedly fraudulent activities meet Rule 9(b)'s particularity requirement).

Rule 9(b) "does not require nor make legitimate the pleading of detailed evidentiary matter." All that is necessary is "identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Walling,* 476 F.2d at 397 (alleging in conclusory fashion that defendant's conduct was fraudulent was not sufficient under Rule 9(b)). See also *Miscellaneous Serv. Workers Local # 427 v. Philco–Ford Corp.,* 661 F.2d 776, 782 (9th Cir.1981) (holding that Rule 9(b) requires a pleader to set forth the "time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation").

### C. Whether Plaintiffs Have Stated Claims Under the CLRA and the UCL

#### 1. Legal Standard Governing CLRA Claims

■ The Consumers Legal Remedies Act makes illegal various "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770(a). Conduct that is "likely to mislead a reasonable consumer" violates the CLRA. *Colgan v. Leatherman Tool Group, Inc.,* 135 Cal.App.4th 663, 680, 38 Cal.Rptr.3d 36 (2006) (quoting *Nagel v. Twin Laboratories, Inc.,* 109 Cal.App.4th 39, 54, 134 Cal.Rptr.2d 420 (2003)). A "reasonable consumer" is "the ordinary consumer acting reasonably under the circumstances," who "is not versed in the art of inspecting and judging a product, [or] in

the process of its preparation or manufacture...." *Id.* (citing 1A CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 5:17(4th ed. 2004)).

■ Section 1770(a)(4) bans the use of "deceptive representations ... in connection with goods or services." Section 1770(a)(5) prohibits "[r]epresenting that goods or services have ... characteristics, ingredients, uses, [or] benefits ... which they do not have...." The CLRA is to be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Colgan,* 135 Cal. App.4th at 680, 38 Cal.Rptr.3d 36.

#### 2. Legal Standard Governing UCL Claims

Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction." CAL. BUS. & PROF.CODE §§ 17201, 17203. "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *Id.,* § 17200. The California Supreme Court has construed the term broadly. See *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) ("[Section 17200] defines 'unfair competition' to include any unlawful, unfair or fraudulent business act or practice.... Its coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law.... By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently ac-

tionable.... However, the law does more than just borrow. The statutory language referring to any unlawful, unfair or fraudulent practice ... makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent" (internal quotations omitted)); see also *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal.App.4th 659, 676–77, 43 Cal.Rptr.3d 148 (2006) ("The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services....' Thus, the scope of the UCL (Bus. & Prof.Code, § 17200 et seq.) is 'broad.' It 'covers a wide range of conduct'" (citations and footnote omitted)).

### 3. Whether Plaintiffs Have Stated a CRLA Claim [39]

Plaintiffs base their UCL and CLRA claims on defendant's allegedly knowing and intentional failure to disclose to class members that, as a result of the rear suspension defect, the class vehicles' tires would suffer premature wear. "Under California law, there are four circumstances in which an obligation to disclose may arise: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *Smith v. Ford Motor Co.*, 749 F.Supp.2d 980, 987 (N.D.Cal.2010) (citing *LiMandri v. Judkins*, 52 Cal.App.4th 326, 337, 60 Cal.Rptr.2d 539 (1997)); see

also *Cirulli v. Hyundai Motor Co.*, No. SACV 08–0854 AG (MLGx), 2009 WL 5788762, *3 (C.D.Cal. June 12, 2009) ("In *Falk*, the Northern District of California found that concealment or a failure to disclose can constitute actionable fraud under the CLRA in four situations: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact," citing *Falk v. Gen. Motors Corp.*, 496 F.Supp.2d 1088, 1095 (N.D.Cal.2007) (quoting *LiMandri*, 52 Cal.App.4th at 327, 60 Cal.Rptr.2d 539)).

Plaintiffs' claims are based on the fact that defendants allegedly "fail[ed] to disclose and conceal[ed] the defective nature of the Class Vehicles and their rear suspension...." [40] Omissions are actionable under the CLRA only when the omission is contrary to a representation actually made by the defendant or where a duty to disclose exists. *Bardin v. Daimlerchrysler Corp.*, 136 Cal.App.4th 1255, 1276, 39 Cal.Rptr.3d 634 (2006) ("Fraud or deceit may consist of the suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact," quoting *Outboard Marine Corp. v. Superior Court*, 52 Cal. App.3d 30, 36–37, 124 Cal.Rptr. 852 (1975)). The facts the defendant knows and conceals must be material. See, e.g., *Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 970–71 (N.D.Cal.2008) (citing the four *LiMandri* factors and stating that "[t]he first condition is not in issue

---

**39.** Defendants largely mount a single set of challenges to plaintiff's CRLA and UCL claims. (MTD at 6.)

**40.** Complaint, ¶ 135.

here. [A]ll of the other situations require materiality"), aff'd, *Oestreicher v. Alienware Corp.*, 322 Fed.Appx. 489 (9th Cir. 2009) (Unpub. Disp.). "[I]n order for non-disclosed information to be material, a plaintiff must show that 'had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Oestreicher*, 544 F.Supp.2d at 971 (quoting *Falk*, 496 F.Supp.2d at 1095, in turn quoting *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993)). As noted, "[m]ateriality ... is judged by the effect on a 'reasonable consumer.'" *Id.* (citing *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App.4th 1351, 1360, 8 Cal.Rptr.3d 22 (2003)).

■ "[W]here, as here, a plaintiff's claim is predicated on a manufacturer's failure to inform its customers of a product's likelihood of failing outside the warranty period, the risk posed by such asserted defect cannot be 'merely' the cost of the product's repair ...; rather, for the omission to be material, the failure must pose 'safety concerns.'" *Smith*, 749 F.Supp.2d at 987 (citing *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 835–38, 51 Cal.Rptr.3d 118 (2006)). "In other words, under California law, and as recently described by the Ninth Circuit: 'A manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue.'" *Id.* at 987–88 (citing *Oestreicher v. Alienware Corp.*, 322 Fed. Appx. 489, 493 (9th Cir.2009) (Unpub. Disp.) (affirming the dismissal of CLRA, UCL and fraudulent concealment claims because plaintiff failed to allege that defendant had "affirmatively misrepresented its products" or that the alleged defect "posed a threat to his own safety or the safety of others")); *O'Shea v. Epson America, Inc.*, No. CV 09–8063 PSG (CWx), 2011 WL 3299936, *8 (C.D.Cal. July 29, 2011) ("[T]he weight of authority suggests that a 'manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue,'" quoting *Oestreicher*, 322 Fed. Appx. at 493). See also *Smith*, 749 F.Supp.2d at 987 ("The California Court of Appeal has held that a manufacturer cannot be found liable under the CLRA for failure to disclose a defect that manifests itself after expiration of the warranty period unless such omission (1) is 'contrary to a representation actually made by the defendant' or (2) pertains to a 'fact the defendant was obligated to disclose,'" quoting *Daugherty*, 144 Cal.App.4th at 835–36, 51 Cal.Rptr.3d 118).

■ Such a rule is consistent with the policies underlying California warranty law. As noted in *Daugherty:*

"[V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time.... [M]anufacturers ... can always be said to 'know' that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations on warranty coverage." *Daugherty*, 144 Cal.App.4th at 830–31, 51 Cal. Rptr.3d 118 (quoting *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir.1986) (alterations original)).

"Indeed, as noted by the district court in *Oestreicher*, 'the purpose of a warranty is to contractually mark the point in time during the useful life of a product when the risk of paying for repairs shifts from

the manufacturer to the consumer.'" *Smith*, 749 F Supp.2d at 988 (citing *Oestreicher*, 544 F.Supp.2d at 972, and *Abraham*, 795 F.2d at 250).

"[T]he rule set forth in *Daugherty* is consistent with the general policy stated by the California Supreme Court that although '[a] consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market,' the consumer nevertheless 'can ... be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.'" *Id.* (citing *Seely v. White Motor Co.*, 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 403 P.2d 145 (1965)). See also *Wilson v. Hewlett–Packard Co.*, No. C–09–2253 RMW, 2009 WL 3021240, *1 (N.D.Cal. Sept. 17, 2009) (dismissing a CLRA claim based on a manufacturer's alleged duty to disclose where the omission did not implicate safety concerns); *Berenblat v. Apple Inc.*, Nos. 08–4969 JF (PVT), 09–1649 JF (PVT), 2009 WL 2591366, *5–7 (N.D.Cal. Aug. 21, 2009) (dismissing claims based on an allegedly defective computer component, because "[t]he failure to disclose a defect that might, or might not, shorten the effective life span of [a product] that functions precisely as warranted throughout the terms of the express warranty" is not actionable); *Morgan v. Harmonix Music Systems, Inc.*, No. C08–5211 BZ, 2009 WL 2031765, *4 (N.D.Cal. July 7, 2009) (dismissing claims based on allegedly defective video game drum pedals because "[a]ccording to all of the relevant case law, defendants are only under a duty to disclose a known defect in a consumer product when there are safety concerns associated with the product's use"); *Hoey v. Sony Electronics, Inc.*, 515 F.Supp.2d 1099, 1105 (N.D.Cal.2007) ("There is no authority that provides that the mere sale of a consumer electronics product in California can create a duty to disclose any defect that may occur during the useful life of the product"). Consequently, the court examines the facts alleged in the complaint under the framework set forth in *Daugherty* and its progeny, and considers whether plaintiffs have alleged a safety defect.[41]

 Defendants contend that plaintiffs have not adequately pled that they had a duty to disclose because they have not

**41.** At oral argument, plaintiffs' counsel suggested that a manufacturer has an obligation to disclose "material" defects that it has "reason to know" will manifest during the warranty period. As noted, however, the case law clearly distinguishes between "latent defects" that defeat a consumer's expectations concerning the product's performance—matters that are properly covered by warranty law—and defects that create unreasonable safety risks after the warranty period has ended. It is only the latter that give rise to a duty to disclose under the CLRA and UCL. *Daugherty*, 144 Cal.App.4th at 832, 51 Cal.Rptr.3d 118 (rejecting plaintiff's "claim [ ]that because the language of Honda's express warranty did not state that the defect must be 'found,' 'discovered' or 'manifest' during the warranty period, the warranty cover[ed] any defect that 'exists' during the warranty period, no matter when or whether a malfunction occurs"). Indeed, plaintiffs' argument to the contrary appears to be specifically foreclosed by Daugherty: "[V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time.... [M]anufacturers ... can always be said to 'know' that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations on warranty coverage." *Daugherty*, 144 Cal.App.4th at 830–31, 51 Cal.Rptr.3d 118.

alleged the existence of a safety issue. They assert that since consumers know that tires have a "finite useful life and [must] be replaced during the ... life of an automobile,"[42] they must also be aware of the risks involved in driving on worn tires. They assert that the allegedly premature tread wear was "open and obvious" to plaintiffs, and should have led them to replace their tires immediately, rather than assuming the risk of continuing to drive on worn tires. Defendants assert that because any safety issues could have occurred "only in the absence of reasonable diligence by vehicle owners," plaintiffs' CLRA claims fail.[43]

These arguments are not convincing. While tires must be replaced periodically, even in non-defective vehicles, the defect alleged in the class vehicles is a problem with their rear suspension. This is neither a maintenance item nor a part whose defect would be open and obvious to the regular driver. Moreover, the mere fact that a tire is a maintenance item does not foreclose the possibility that there are safety concerns with the class vehicles. Brakes require regular maintenance and replacement, but it would be difficult to argue that a brake defect would not be a safety issue. See *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liab. Litig.*, 754 F.Supp.2d 1145, 1173 (C.D.Cal. 2010) ("The Court is convinced that a safety consideration as fundamental as whether a car is able to stop when the brakes are applied is material to consumers.")

Defendants assert that plaintiffs assumed the risk of any potential defect by continuing to drive "for tens of thousands of miles" after identifying excessive wear on the tires.[44] Because the root cause of the problem is allegedly the rear suspension, however, class members would not immediately have known that wear on the tires was symptomatic of a more serious underlying defect. It is also plausible that because the tire wear occurred gradually and at an unexpectedly early time, the severity of the defect may not have been immediately evident to owners or lessees of the vehicles because it would take some time for the problem to progress to the stage where it would affect the car's functioning. Plaintiffs, moreover, allege that the defect in the rear suspension causes "uneven vehicle weight distribution," which causes uneven tire wear.[45] The fact that the wear is spread unevenly across the width of the tire indicates that a tire wear gauge might not accurately have reflected the extent of the problem.[46] Consequently, even if a reasonable consumer is checking for problems with the tires, inspection and measurement of the tire may not disclose any reason for concern. The difficulty of discovering the symptoms of the problem (uneven tire wear), combined with the impossibility a reasonable consumer would face independently diagnosing the root of the problem (suspension defects),

---

42. MTD at 7.

43. MTD at 8.

44. *Id.*

45. FAC, ¶ 6. The contents of the Honda TSB indicate that Honda itself became aware at some point that the problem would cause uneven wear. The TSB is titled "Uneven or Rapid Rear Tire Wear." (TSB at 1.) The second page of the TSB contains photographs of tires that have experienced uneven wear, purportedly demonstrating that the defect causes the "inner" edge of the tire to wear out significantly more quickly than the "outer" edge of the tire. (TSB at 2.) While the court cannot take judicial notice of the truth of the statements in the TSB, at a minimum the document establishes Honda's belief that tire wear was uneven across the width of the tire.

46. *Id.*, ¶ 6 n. 3.

further undercuts the suggestion that class members were "on notice" of the defect's consequences.

Defendants acknowledge that two plaintiffs, Wright and Zdeb, allege that their tires blew out while driving, which would certainly present a safety defect.[47] Defendants assert, however, that these plaintiffs have failed to plead a causal connection between the blowouts and the alleged defect adequately, offering "only a conclusory allegation of a safety issue, which is insufficient."[48] Defendants' primary authority for this proposition is *Tietsworth v. Sears, Roebuck & Co.*, 720 F.Supp.2d 1123 (N.D.Cal.2010), which examined allegations of a safety defect in a different context, i.e., to assess whether plaintiff had alleged injury in fact. See *Ehrlich v. BMW of North America LLC*, 801 F.Supp.2d 908, 918 (C.D.Cal.2010) ("BMW points out that Plaintiff has not alleged that the defective windshields have actually caused injuries in any rollover accidents, relying on *Tietsworth v. Sears, Roebuck & Co.* ... BMW further speculates that injuries would not occur unless an owner makes a conscious decision to drive a MINI with a cracked windshield and then gets into a rollover accident. The Court is not persuaded by *Tietsworth* or BMW's arguments that Plaintiff must plead that consumers have been injured by the alleged unreasonable safety risk. *Tietsworth* approached the safety defect issue in terms of actual injury to the named plaintiffs, finding that they 'lacked standing' to pursue their claims based on merely posited injuries.... Here, Plaintiff has alleged that he was injured by the defective windshields by having to replace the cracked windshield in his MINIs twice; BMW has not argued that he lacks standing to pursue those claims. The alleged unreasonable risk of safety created by compromised windshields during rollover accidents is relevant to the materiality of BMW's omissions, and Plaintiff has alleged a plausible unreasonable safety risk that would have been material to the reasonable consumer"). As in *Ehrlich*, defendants here do not, and could not, contend that plaintiffs have failed to plead injury-in-fact sufficiently. *Cholakyan v. Mercedes–Benz USA, LLC*, 796 F.Supp.2d 1220, 1230 (C.D.Cal.2011) ("Cholakyan need only allege that he suffered a concrete financial loss to demonstrate actual injury in fact"); *In re Toyota Motor Corp.*, 754 F.Supp.2d at 1160 ("The Court agrees with Plaintiffs that experiencing an SUA defect is not required for standing. Standing merely requires a redressable injury that is fairly traceable to Defendants' conduct"). Consequently, *Tietsworth* is inapposite.

Drawing all inferences in plaintiffs' favor, the court finds defendants' argument unpersuasive at this stage of the litigation. It is plausible that defects in the rear suspension that led to unexpected tire wear could give rise to the safety concerns alleged in the complaint. Courts considering similar allegations have reached this conclusion. See *Marsikian v. Mercedes Benz USA, LLC*, No. CV 08–4876 AHM (JTLx), 2009 WL 8379784, *6–7, 2009 U.S. Dist. LEXIS 117012, *16–17 (C.D.Cal. May 4, 2009) (denying a motion to dismiss a CLRA claim where plaintiff alleged that Mercedes–Benz air intake systems were "susceptible to clogging" and that the defect could lead to "substantial electrical failure," because "it is not implausible that the [clogging] would cause 'catastrophic engine and electrical system failure' while the car is on the road"); *Ehrlich*, 801 F.Supp.2d at 918 (denying a motion to dismiss a CLRA claim where "Plaintiff has alleged that he was injured by the defec-

47. *Id.*, ¶¶ 54, 86.

48. MTD at 8. .

tive windshields by having to replace the cracked windshield in his MINIs twice.... The alleged unreasonable risk of safety created by compromised windshields during rollover accidents is relevant to the materiality of BMW's omissions, and Plaintiff has alleged a plausible unreasonable safety risk that would have been material to the reasonable consumer," citing *Marsikian*, 2009 WL 8379784 at *6–7, 2009 U.S. Dist. LEXIS 117012 at *16–17); see also *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir.2011) (observing that "[u]nder California law, a misrepresentation or omission is material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is *so obviously unimportant* that the jury could not reasonably find that a reasonable man would have been influenced by it." (emphasis added)).

Because plaintiffs have adequately alleged a safety defect, they have sufficiently

pled a material failure to disclose for purposes of the CLRA and UCL.[49] The court therefore denies defendant's motion to dismiss on this basis.[50]

## D. Whether Plaintiffs Have Stated a Claim for Breach of Implied Warranty Under the Song–Beverly Act

The Song–Beverly Consumer Warranty Act ("Song–Beverly Act") was enacted to regulate warranties and strengthen consumer remedies for breaches of warranty. *National R.V., Inc. v. Foreman*, 34 Cal. App.4th 1072, 1077, 40 Cal.Rptr.2d 672 (1995). The act is intended to protect purchasers of "consumer goods," defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables." Cal. Civ.Code § 1791(a). Unless specific disclaimer methods are followed, an implied warranty of merchantability accompanies every retail sale of consumer goods in the state. Cal. Civ.Code § 1792; see also *Music Acceptance Corp. v. Lofing*,

**49.** Defendants do not appear to argue that they had no duty to disclose the existence of a material safety issue.

**50.** As plaintiffs have successfully alleged a CLRA violation (as well as violations under other statutes), they have successfully stated a claim under the UCL's "unlawful" prong. Insofar as plaintiffs' UCL claims rely on the "unfair" prong, however, defendants contend that plaintiffs have failed to state a UCL claim because they do not allege the manner in which defendants' conduct was unfair. (MTD at 9.) California courts have articulated two possible standards for "unfairness" under the UCL. Under the first, a plaintiff must show that the harm to the consumer of a particular practice outweighs its utility to defendant. See *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861, 887, 85 Cal. Rptr.2d 301 (1999). Under the second, a plaintiff must allege unfairness that is "tethered to some legislatively declared policy." *Cel–Tech Communications*, 20 Cal.4th at 186, 83 Cal.Rptr.2d 548, 973 P.2d 527. Defen-

dants' argument regarding the first formulation of the test depends entirely on its contention that the rear suspension defect is not a safety problem. The court has addressed this and concluded that a safety defect is adequately pled. Defendants' argument regarding the second formulation of unfairness also fails, as plaintiffs have successfully asserted a claim under the CLRA. The court reiterates, moreover, that Business and Professions Code § 17200 is written in the disjunctive. An act or practice can be unlawful, unfair, or fraudulent. *Cel–Tech Communications*, 20 Cal.4th at 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (" 'In other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa,' " quoting *Podolsky v. First Healthcare Corp.*, 50 Cal.App.4th 632, 647, 58 Cal.Rptr.2d 89 (1996)). Here, it would appear that plaintiffs allege deceptive practices, in that they assert defendants failed to disclose material information concerning the class vehicles. At a minimum, therefore, plaintiffs have alleged a fraudulent and deceptive practice.

32 Cal.App.4th 610, 619, 39 Cal.Rptr.2d 159 (1995).[51]

 Under the act, an implied warranty of merchantability guarantees that "consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; (4) Conform to the promises or affirmations of fact made on the container or label." CAL. CIV.CODE § 1791.1(a). "Unlike express warranties, which are basically contractual in nature, the implied warranty of merchantability arises by operation of law.... [I]t provides for a minimum level of quality." *American Suzuki Motor Corp. v. Superior Court*, 37 Cal.App.4th 1291, 1295–96, 44 Cal.Rptr.2d 526 (1995). Thus, a plaintiff claiming breach of an implied warranty of merchantability must show that the product "did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App.4th 402, 406, 7 Cal.Rptr.3d 546 (2003) (citing CAL. COM. CODE § 2314(2)); see also *Pisano v. American Leasing*, 146 Cal. App.3d 194, 198, 194 Cal.Rptr. 77 (1983) ("Crucial to the inquiry is whether the product conformed to the standard performance of like products used in the trade").

Consistent with this general principle, the implied warranty of merchantability set forth in § 1791.1(a) requires only that a vehicle be reasonably suited for ordinary use. It need not be perfect in every detail so long as it "provides for a minimum level of quality." *American Suzuki*, 37 Cal. App.4th at 1296, 44 Cal.Rptr.2d 526 (quoting *Skelton v. General Motors Corp.*, 500 F.Supp. 1181, 1191 (N.D.Ill.1980), rev'd. on other grounds, 660 F.2d 311 (7th Cir. 1981)); see also 1 White & Summers, UNIFORM COMMERCIAL CODE, § 9–8 at 523 (4th ed. 1995) ("An item can 'pass without objection' and yet be considerably short of perfection"). The basic inquiry, therefore, is whether the vehicle was fit for driving. See *Carlson v. General Motors Corp.*, 883 F.2d 287, 297 (4th Cir.1989) ("Since cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a safe condition and substantially free of defects. Thus, where a car can provide safe, reliable transportation, it is generally considered merchantable"), cert. denied, 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 287 (1990); *Skelton*, 500 F.Supp. at 1191 ("Automobiles are designed for driving, and therefore the question in this case is

---

**51.** As defendants correctly note, "[a]pplication of the Song–Beverly Act is expressly limited to goods sold in California." *Gusse v. Damon Corp.*, 470 F.Supp.2d 1110, 1112 (C.D.Cal.2007) (citing CAL. CIV. CODE §§ 1792, 1792.1, 1792.2, 1793.3, 1793.6). As a result, plaintiffs Garcia, Ellis, Wright Henkle and Zebb cannot assert claims under the act, since they purchased their cars outside California. Their claims under the Song–Beverly Act are therefore dismissed.

Plaintiffs do not dispute this, but assert that named plaintiffs who purchased their cars out-of-state can represent a proposed California sub-class. (Opp. at 14.) This is incorrect. To represent a subclass under Rule 23(a)'s typicality requirement, the sub-

class representative must be a member of the subclass he or she seeks to represent. FED. R. CIV. PROC. 23(c)(5) ("When appropriate, a class may be divided into *subclasses that are each treated as a class under this rule*" (emphasis added)); *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981) ("[E]ach subclass must independently meet the requirements of Rule 23 for the maintenance of a class action.... Consequently, the fundamental requirement that the representative plaintiff must be a member of the class he represents is completely lacking on the record before us"). Thus, plaintiffs who did not purchase their cars in California cannot represent a subclass of individuals who did.

whether the GM vehicles at issue were fit for that purpose"); *American Suzuki,* 37 Cal.App.4th at 1296, 44 Cal.Rptr.2d 526 ("Courts in other jurisdictions have held that in the case of automobiles, the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation"); see also 1 White & Summers, UNIFORM COMMERCIAL CODE, § 9–8 at 523 ("Although more or less a synonym of 'fit for ordinary purposes,' the 'pass without objection' phrase focuses more clearly on trade usage, similar goods, and on the seller's conduct"); *Mercedes–Benz of North America, Inc. v. Garten,* 94 Md.App. 547, 563, 618 A.2d 233, 240 (Md. App.1993) (noting that "the car in question was accepted by another Mercedes–Benz dealer as a trade-in" in evaluating whether a 1990 300E "passed without objection in the trade under the contract description").

■ A vehicle that has been materially damaged will not "pass without objection" in the trade as a "new car." See, e.g., *Thomas v. Ruddell Lease–Sales, Inc.,* 43 Wash.App. 208, 214, 716 P.2d 911, 915 (Wash.App.1986) ("The evidence demonstrates that a significant segment of the buying public objects to buying a Corvette that has been damaged and repaired. Therefore, a wrecked and repaired Corvette does not pass *without* objection in the trade as a 'used Corvette' " (emphasis original)); see also *Currier v. Spencer,* 299 Ark. 182, 186, 772 S.W.2d 309, 311 (Ark. 1989) ("Currier warranted the car to be a one owner 1984 Datsun. What Spencer purchased was two-thirds of one car and

one-third of another [welded together]. . . . [T]he court [properly] found that the car could not 'pass without objection in the trade under the contract description' "); *Luther v. Bud–Jack Corp.,* 72 Misc.2d 924, 926–27, 339 N.Y.S.2d 865, 868 (N.Y.Sup.Ct. 1972) ("Section 2–314 of the Uniform Commercial Code provides that in a sale of a new automobile such as occurred herein, the dealer gives to the purchaser an implied warranty of merchantability, [including] that . . . the automobile would be at least such as would pass without objection in the trade under the contract description. . . . The jury was instructed that it had to determine, therefore, . . . whether the 1971 Fiat which the plaintiff bought from the defendant complied with the standards of quality which a purchaser would ordinarily be entitled to expect when buying a new car of the same type"). In this regard, California courts "reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability. A vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose." *Isip v. Mercedes–Benz USA, LLC,* 155 Cal. App.4th 19, 27, 65 Cal.Rptr.3d 695 (2007).

■ The only class member who can assert claims under the Song–Beverly Act is Keegan.[52] Defendants contend that Keegan did not allege he is in vertical privity with them, and therefore cannot state a claim for breach of the implied warranty of merchantability.[53] Other California courts have rejected this proposition, however, and held that the act did

---

52. As noted, most of the plaintiffs purchased their cars outside California and cannot assert claims under the Song–Beverly Act. Plaintiff Kolstad purchased a used car in California, meaning that no warranties by Honda were in effect at the time of purchase. (Complaint, ¶ 60); see also CAL. CIV CODE § 1791(a) (defining "consumer goods" as "any *new* product

or part thereof that is used, bought or leased for use primarily for personal, family or household purposes"). Plaintiffs acknowledge that Kolstad cannot assert a breach of implied warranty claim under the Song–Beverly Act. (Opp. at 14.)

53. MTD at 13.

away with the vertical privity requirements that apply to implied warranty causes of action. *Ehrlich*, 801 F.Supp.2d at 921 ("However, the Court agrees with Plaintiff and the weight of authority that the plain language of section 1792 of the Song–Beverly Act does not impose a similar vertical privity requirement"); *NVIDIA GPU Litig.*, No. 08–4312 JW, 2009 WL 4020104, *4 & n. 7 (N.D.Cal. Nov. 19, 2009) (noting a split in the case law and concluding that there was no privity requirement under the act); *Gonzalez v. Drew Industries*, 750 F.Supp.2d 1061, 1072–73 (C.D.Cal.2007) (finding no privity requirement based on the plain language of the statute); *Gusse v. Damon Corp.*, 470 F.Supp.2d 1110, 1116 n. 9 (C.D.Cal.2007) (imposing a privity requirement would "ignore[ ] the plain language of the Song–Beverly Act" that all goods sold at retail are accompanied by the manufacturer's implied warranty).[54]

Keegan, moreover, purchased his Honda Civic from Dublin Honda. Other courts considering similar factual circumstances have held that individuals who purchase a vehicle from an authorized dealership can maintain an implied warranty cause of action against the manufacturer as third party beneficiaries. See *In re Toyota Motor Corp.*, 754 F.Supp.2d at 1185 ("[W]here a plaintiff pleads that he or she is a third-party beneficiary to a contract that gives rise to the implied warranty of merchantability, he or she may assert a claim for the implied warranty's breach. Here, Plaintiffs have pled that they purchased vehicles from a network of dealers who are agents of Defendants.... 'The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.' ... [Plaintiffs therefore] allege facts tending to support that they are third-party beneficiaries; therefore, Plaintiffs' breach of implied warranty claim is not precluded by the lack of vertical privity").[55]

In their reply, defendants raise the new argument that Keegan's claim fails because he does not allege his vehicle

**54.** Defendants cite *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir.2008), and *Arabian v. Sony Elecs., Inc.*, No. 05–CV–1741 WQH (NLS), 2007 WL 627977 (S.D.Cal. Feb. 22, 2007), to support their contention that privity is required under the Song–Beverly Act. Both cases deal only with privity requirements under California's general implied warranty laws. See *Clemens*, 534 F.3d at 1023 (stating that plaintiff had invoked the implied warranty provisions of California Commercial Code § 2314); *Arabian*, 2007 WL 627977 at *10 (stating that "California has a vertical privity requirement" and citing *U.S. Roofing, Inc. v. Credit Alliance Corp.*, 228 Cal.App.3d 1431, 279 Cal.Rptr. 533 (1991), which addressed privity requirements under California's general implied warranty law). The authority is therefore inapposite in assessing claims under the Song–Beverly Act.

**55.** Defendants also contend that the Song–Beverly Act requires that a consumer give the seller "a reasonable number of attempts" to cure a defect before replacement or restitution is mandated. (MTD at 13.) The statutory provision they cite, however, applies only to express warranties. CAL. CIV.CODE § 1793.2(d)(2) ("If the manufacturer or its representative in this state is unable to service or repair a new motor vehicle ... to conform to the applicable *express* warranties after a reasonable number of attempts ..." (emphasis added)). Plaintiffs here sue for breach of the implied warranty of merchantability. California courts have held that § 1793.2 does not apply to claims for breach of implied warranty. *Mocek v. Alfa Leisure, Inc.*, 114 Cal.App.4th 402, 406–08, 7 Cal.Rptr.3d 546 (2003) ("The Act's provisions requiring repairs after breach of an express warranty are lengthy and detailed. There is no reason to believe failure to set out the same process in case of a breach of the implied warranty of merchantability was an oversight").

was unmerchantable during the one-year implied warranty period established by the Song–Beverly Act. See CAL. COM.CODE § 1797.1(c) ("[I]n no event shall such implied warranty have a duration of less than 60 days nor more than one year following the sale of new consumer goods to a retail buyer"). This gap, however, does not doom Keegan's claims at the outset. "A vehicle that operates for some time after purchase may still be deemed "unfit for ordinary purposes" if its components are so defective that the vehicle becomes inoperable within an unacceptably short period of time." *Cholakyan*, 796 F.Supp.2d at 1243; see also, e.g., *Hornberger v. General Motors Corp.*, 929 F.Supp. 884, 888 (E.D.Pa.1996) ("[A] material question of fact does exist as to whether a normal transmission of a newly leased vehicle would fail after being driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and, therefore, unmerchantable"). Thus, the " 'implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale,' so '[i]n the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery.' " *Ehrlich*, 801 F.Supp.2d at 922 ("In *Mexia*, the plaintiff brought a claim for breach of the implied warranty of merchantability under the Song—Beverly Act for a boat he purchased that contained a latent defect causing its engine to corrode. The plaintiff had purchased the boat on April 12, 2003, and the alleged defect arose in July 2005. The plaintiff took it [to] an authorized boat dealer for repairs, but the condition persisted and the plaintiff sued on November 27, 2006, for a violation of the Song–Beverly Act. Citing the statute, the defendants argued that the plaintiff's latent defect claim expired one year after purchase, even though the defect manifested itself two years after purchase. The court concluded at the demurrer stage that the plaintiff's warranty claim over the alleged latent defect was not barred by the one-year duration provision in the Song—Beverly Act.... The court first rejected the argument because it 'ignores the distinction between unmerchantability caused by a latent defect and the subsequent discovery of the defect; the fact that the alleged defect resulted in destructive corrosion two years after the sale of the boat does not necessarily mean that the defect did not exist at the time of the sale,' " quoting *Mexia v. Rinker Boat Co.*, 174 Cal.App.4th 1297, 1301–02, 1304–06, 95 Cal.Rptr.3d 285 (2009)).

Keegan does not allege the specific date he learned of tire wear and the rear suspension defect. Under applicable law, however, his failure to discover the defect within the one-year statutory period does not defeat his claim at this stage of the litigation. Consequently, the court concludes that Keegan has adequately pled a claim under the Song–Beverly Act.

### E. Whether Plaintiffs Have Stated a Claim for Breach of Express Warranty Under Commercial Code § 2313

Plaintiffs' fifth cause of action pleads a claim for breach of express warranty under California Commercial Code § 2313. Plaintiffs assert that Honda expressly warranted to "all purchasers and lessees of the Class Vehicles" that it would repair or replace any defect in their vehicle at no cost to the owner or lessee.[56] They contend that defendants sold and leased class vehicles with defective control arms that required repair or replacement within the warranty period, and refused to honor the express warranty by failing to repair or replace the control arms and other compo-

---

56. FAC, ¶ 180.

nent parts related to the suspension defect free of cost.[57]

California Commercial Code § 2313, which defines the term express warranty, applies to "transactions in goods." See CAL. COM.CODE § 2102; see also CAL. CIV. CODE § 1791.2(a)(1) (defining "express warranty" as "[a] written statement arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer, distributor, or retailer undertakes to preserve or maintain the utility or performance of the consumer good or to provide compensation if there is a failure in utility or performance"); BLACK'S LAW DICTIONARY at 1582 (7th ed.1999) (defining "express warranty" as "[a] warranty created by the overt words or actions of the *seller*"); 3 B.E. Witkin, SUMMARY OF CALIFORNIA LAW, §§ 55–56 (9th ed.1990); Richard A. Lord, WILLISTON ON CONTRACTS 4TH § 52.45 (4th ed. 2004) ("Under the [Uniform Commercial] Code, an express warranty is usually associated with a contract for the sale of goods, but may be found in connection with other transactions involving goods.... There is a division of opinion whether the express warranty concepts in the Code are also applicable or may be extended to service agreements").

An express warranty is a term of the parties' contract. See *A.A. Baxter Corp. v. Colt Industries, Inc.,* 10 Cal.App.3d 144, 153, 88 Cal.Rptr. 842 (1970) ("A warranty is as much one of the elements of sale and as much a part of the contract of sale as any other portion of the contract and is not a mere collateral undertaking.... [T]o constitute an express warranty, the state-

ment must be a part of the contract"); Richard A. Lord, WILLISTON ON CONTRACTS 4TH § 52.45 (4th ed. 2004) (stating that an express warranty is "a term of the parties' contract"); see *Paularena v. Superior Court of San Diego County,* 231 Cal. App.2d 906, 915, 42 Cal.Rptr. 366 (1965) ("The damages which each set of plaintiffs seek[s] through their [breach of warranty] cause[ ] of action are dependent upon their affirmance of the existence of a contract").

■ To prevail on a breach of express warranty claim, a plaintiff must prove that the seller: "(1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff." *Rodarte v. Philip Morris,* No. 03–0353FMC, 2003 WL 23341208, *7 (C.D.Cal. June 23, 2003).

Defendants assert that Keegan's claim for breach of express warranty should be dismissed because under California law, a plaintiff must give the defendant notice of the breach before filing suit.[58] The Ninth Circuit recently affirmed this rule, holding that "[t]o avoid dismissal of a breach of contract or breach of warranty claim in California, '[a] buyer must plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach.'" *Alvarez v. Chevron Corp.,* 656 F.3d 925, 932 (9th Cir. 2011) (quoting *Stearns v. Select Comfort Retail Corp.,* 763 F.Supp.2d 1128, 1142 (N.D.Cal.2010) (citations omitted) and citing CAL. COM.CODE § 2607(3)(A));[59]

57. *Id.*

58. Defendants do not seek dismissal of other plaintiffs' express warranty claims, presumably because they gave notice of the breach. Plaintiffs, for their part, concede that Kolstad cannot assert a breach of express warranty claim against Honda because her vehicle was

not covered by a Honda warranty at the time of purchase. (Opp. at 23.)

59. The *Alvarez* court was reviewing a dismissal under Rule 12(b)(6). 656 F.3d at 928–29. Thus, plaintiffs' assertion that the question of notice should be determined by the trier of fact is unavailing. (Opp. at 24.)

*Stearns,* 763 F.Supp.2d at 1142–43 ("A buyer also must plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach"); *Pollard v. Saxe & Yolles Dev. Co.,* 12 Cal.3d 374, 380, 115 Cal.Rptr. 648, 525 P.2d 88 (1974) ("The requirement of notice of breach is ... designed to allow the defendant opportunity for repairing the defective item, reducing damages, avoiding defective products in the future, and negotiating settlements").

Plaintiffs counter that a consumer who purchased goods through a dealer, rather than directly from the manufacturer, is not required to give the latter notice before filing suit. Other courts in this circuit have reached this conclusion. A pre-*Alvarez* case, *Sanders v. Apple, Inc.,* 672 F.Supp.2d 978 (N.D.Cal.2009), concluded that "timely notice of a breach of an express warranty is not required where the action is against a manufacturer and is brought 'by injured consumers against manufacturers with whom they have not dealt.'" *Id.* at 989 (quoting *Greenman v. Yuba Power Prods.,* 59 Cal.2d 57, 61, 27 Cal.Rptr. 697, 377 P.2d 897 (1963)). The *Sanders* court observed that this rule was "designed to protect a consumer who 'would not be aware of his rights against the manufacturer.... [A]t least until he has had legal advice it will not occur to him to give notice to one with whom he has had no dealings.'" *Id.* (quoting *Greenman,* 59 Cal.2d at 61, 27 Cal.Rptr. 697, 377 P.2d 897); see also *Toyota Motor Corp.,* 754 F.Supp.2d at 1180 ("Except as to those relatively few Plaintiffs (such as at least one non-consumer Plaintiff) who allege they purchased their vehicles directly from Defendants, this requirement is excused as to a manufacturer with which the purchaser did not deal"); *Aaronson v. Vital Pharmaceuticals, Inc.,* 09–CV–1333 W(CAB), 2010 WL 625337, *5 (S.D.Cal. Feb. 17, 2010) (citing *Greenman* for the proposition that "[i]n claims against a manufacturer of goods, however, California law does not require notice"). In contrast to these cases, *Alvarez* was a suit brought by individual retail customers of gas directly against the sellers; it did not address the type of situation at issue in *Sanders* and *Greenman.*

▮ Defendants do not assert that Keegan should have notified them directly. Rather, they contend that he should have given the Honda dealership from whom he purchased his automobile notice, and afforded it a reasonable opportunity to cure in order to effectuate the statute's purposes.[60] While this argument has some basis in the statutory text,[61] defendants cite no state or federal case law indicating that a consumer must provide notice to a dealer of the manufacturer he intends to sue before filing suit.[62] Consequently, the

---

Plaintiffs also contend that collective notice suffices, citing *Metowski v. Traid Corp.,* 28 Cal.App.3d 332, 104 Cal.Rptr. 599 (1972). That case opined that "[c]onceivably, the statutory demand for notice might be satisfied by proof of complaints from some but not all the buyers of the product. Such an approach might be particularly appropriate where the failure of the merchandise to conform to express warranties was known to or reasonably discoverable by the seller at the time of the sales." *Id.* at 339, 104 Cal.Rptr. 599. This statement was dicta, however, and plaintiffs cite no authority specifically endorsing the concept of collective notice.

**60.** MTD at 16–17.

**61.** The statute states that "[t]he buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy...." Cal. Com.Code § 2607(3)(A). Defendants assert that the statute does not specify that the buyer must provide notice to the entity it ultimately names as a defendant.

**62.** The only authority defendants cite is *Fieldstone Co. v. Briggs Plumbing Prods. Inc.,* 54 Cal.App.4th 357, 369, 62 Cal.Rptr.2d 701 (1997), which dealt with a significantly different factual situation. There, a real estate

court follows *Greenman, Sanders, Toyota,* and *Aaronson* in concluding that under California law, a consumer need not provide notice to a manufacturer before filing suit against them.[63]

## F. Whether Plaintiffs Have Stated Claims Under the Express and Implied Warranty Statutes of Various States

The sixth claim for relief alleges violations of the express warranty laws of various states on behalf of various plaintiffs, including Florida (Zdeb), Idaho (Ellis), Montana (Wright), New York (Garcia), and North Carolina (Hinkle). Defendants move to dismiss Zdeb's express warranty claim for failure to give notice to his dealer. See FLA. STAT. § 672.607(3)(a) (2011) ("The buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . ."); see also *Cohen v. Implant Innovations, Inc.,* 259 F.R.D. 617, 642 (S.D.Fla. 2008) ("What constitutes a reasonable time is a highly individualized factual determination for each putative class member and will depend on differing facts and circumstances"); *Hapag–Lloyd, A.G. v. Marine Indem. Ins. Co. of America,* 576 So.2d 1330, 1330 (Fla.App.1991) ("[T]he appellee did operate the toploader for at least four weeks, without repair or notice, until the

---

developer sued a sink manufacturer for alleged defects in sinks that had been installed by subcontractors pursuant to the developer's specifications. *Id.* at 362, 62 Cal.Rptr.2d 701. As a threshold matter, it is unclear whether the developer purchased the sinks directly from the manufacturer. There is no mention, however, of a dealer through which the developer dealt. The *Fieldstone* court acknowledged *Greenman's* holding, but distinguished it on the basis that "plaintiff [was] a sophisticated development company which ha[d] built many thousands of homes over the last two decades." As a result, it concluded that the case before it was different from the typical situation in which consumer " 'would not be aware of his rights as against the manufacturer until he had received legal advice predicated upon an adequate investigation of the facts as to the manufacturer's participation in the chain of events culminating in damage to the plaintiff.' " *Id.* at 370, 62 Cal.Rptr.2d 701 (quoting *Presiding Bishop v. Cavanaugh,* 217 Cal.App.2d 492, 515, 32 Cal.Rptr. 144 (1963)). Given the differences noted, *Fieldstone* does not constitute persuasive authority for the proposition defendants advance.

**63.** Plaintiffs alternatively contend that Keegan did give pre-suit notice, as he put his Honda dealership on notice of the tire wear, and "complained to Honda about the Suspension Defect." (FAC, ¶ 21.) The complaint alleges, albeit in conclusory fashion, that Honda dealers were defendants' agents for purposes of vehicle repair. (Complaint, ¶¶ 15, 121.) To the extent this is true, this would support a finding that any notice required could be provided to the dealers rather than directly to defendants themselves. If Keegan wishes to rely on this theory, however, he would have to plead facts supporting the conclusion that the dealers are defendants' agents.

Keegan allegedly lodged a complaint with his dealer "prior to [the time Keegan] replac[ed] his second set of tires," at a time when he had driven his Honda Civic between 25,000 and 45,000 miles. (*Id.,* ¶ 20.) Defendants contend this did not constitute notice "within a reasonable time after [Keegan] discover[ed] or should have discovered [the] breach." (MTD at 17 (quoting CAL. COM. CODE § 2607(3)(A)).) The complaint does not state precisely when Keegan discovered the problem and notified Honda. Whether or not notice was given within a reasonable time, however, is a fact question that cannot be determined in the context of a motion to dismiss. See *Strzakowlski v. General Motors Corp.,* No. Civ.A. 04–4740, 2005 WL 2001912, *3 (D.N.J. Aug. 16, 2005) ("[W]hether this notice-by-suit was provided within a reasonable time is a question for the fact finder. Therefore, the timing question is beyond the scope of a motion to dismiss for failure to state a claim"); see also *Taylor v. JVC Americas Corp.,* Civil Case No. 07–4059(FSH), 2008 WL 2242451, *6 (D.N.J. May 30, 2008) (holding that "the 'reasonable time' requirement [for pre-suit notice] is an issue for the fact finder and not an issue to be decided on a motion to dismiss").

wiring caused an explosion in the engine which severely damaged the equipment. The purchaser gave notice of the claim that the express warranty had been breached only after the accident and damages had occurred. In these circumstances, we find as a matter of law that the buyer did not give the notice to the seller of the alleged breach 'within a reasonable time after [it] discover[ed] or should have discovered any breach,' as is required to permit a recovery for breach of warranty under section 672.607(3)(a), Florida Statutes (1979)"); but see *Federal Ins. Co. v. Lazzara Yachts of North America, Inc.*, No. 8:09–CV–607–T–27MAP, 2010 WL 1223126, *5 & n. 5 (M.D.Fla. Mar. 25, 2010) (stating that "[t]he parties ha[d] not cited to any Florida case extending section 672.607(3)(a)'s notice requirements to a manufacturer," but noting that "[m]any courts recognize that notice to the seller is sufficient to comply with the statute because 'in most nationwide product distribution systems, the seller/representative dealer may be presumed to actually inform the manufacturer of any major product defects,'" citing *Cooley v. Big Horn Harvestore Systems, Inc.*, 813 P.2d 736 (Colo.1991)).

■ The complaint alleges that on April 8, 2010, Zdeb took his vehicle to Costco Tire Center to replace the two rear tires; this occurred after he had already replaced the tires twice (once following a blowout).[64] At the time he replaced the two rear tires, his odometer showed that he had driven the vehicle approximately 56,000 miles.[65] At some point after this third tire replacement, Zdeb conducted research to determine why the problem con-

tinued to recur. He learned that "the premature and uneven tire wear ... he was experiencing may have been caused by the vehicle's defective rear upper control arms." [66] On November 18, 2010, he visited his Honda dealership to complain about the potential defect in the rear control arms.[67] While the complaint does not allege when Zdeb discovered that the warranty may have been breached, it appears he took reasonable steps to notify the dealer after he researched the issue and discovered the potential cause of the problem. At most, the gap between his discovery of the problem and his notification to the dealer was seven months. See *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1102 (11th Cir.1983) ("Where the buyer gives some notice of the breach, the issues of timeliness and sufficiency are questions of fact."). Whether Zdeb should have learned of the defect at an earlier point in time is a quintessential question of fact. Consequently, the court finds that Zdeb has adequately pled that he complied with the pre-suit notice provision of the Florida statute.[68]

■ The seventh claim for relief alleges violations of Florida's, Idaho's, Montana's, New York's, and North Carolina's implied warranty statutes. Defendants move to dismiss the claims of plaintiffs Ellis, Garcia, and Zdeb, under the laws of Idaho, New York, and Florida, as none of the plaintiffs is in direct vertical privity with defendants. All three states require that there be privity between a plaintiff and defendant. See *Mesa v. BMW of North America, LLC*, 904 So.2d 450, 458

---

64. FAC, ¶¶ 85–88.

65. *Id.*, ¶ 88.

66. *Id.*, ¶ 89.

67. *Id.*, ¶ 90.

68. Given its conclusion regarding this issue, the court declines to address whether, under Florida law, § 672.607(3)(a) requires that a consumer give a manufacturer, rather than a retailer, notice before filing an express warranty claim against the manufacturer.

(Fla.App.2005) ("Under Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity"); *Spolski Gen. Contractor v. Jett–Aire Corp. Aviation Mgmt. of Cent. Fla., Inc.,* 637 So.2d 968, 968 (Fla.App. 1994) ("Judgment on the pleadings and final summary judgment were properly granted for Moore because there was no sale from Moore to Spolski, no privity between Spolski and Moore, no contract between Spolski and Moore, no reliance by Spolski on any warranty, no warranty given to Spolski, and no indemnity because there was no relationship between Spolski and Moore on the Jett–Aire project"); see also *Arthur Jaffee Associates v. Bilsco Auto Service, Inc.,* 58 N.Y.2d 993, 461 N.Y.S.2d 1007, 448 N.E.2d 792, 792 (1983) ("[T]here being no privity between the purchaser and the defendant there can be no implied warranty" under New York law); *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.,* 97 Idaho 348, 544 P.2d 306, 312 (1975) ("We agree with Professor Prosser's quoted statements and the cases listed above, and conclude that privity of contract is required in a contract action to recover economic loss for breach of implied warranty").

The concept that privity of contract is required in an action for breach of the implied warranty of merchantability is well established, and plaintiffs do not deny that such a requirement must be pled.[69] Nor does the authority they cite hold otherwise. See *Capodanno v. Premier Transp. & Warehousing, Inc.,* No. 09–80534–CIV, 2010 WL 1329938, *3 (S.D.Fla. Mar. 29, 2010) ("Specifically, Premier states that it bought the truck from Navistar's agent, such that Premier was therefore in privity to Navistar. This claim is not clear from Premier's allegations"); *Gordon v. Ford Motor Co.,* 239 A.D.2d 156, 657 N.Y.S.2d 43, 43 (1997) ("Defendant correctly argues that there can be no implied warranty absent privity between itself and plaintiffs, but, as [the] motion court explained, such privity would exist if the dealerships with which plaintiffs dealt were defendant's sales or leasing agents, and disclosure is needed with respect to the latter possibility" (internal citation omitted)); *Peckham v. Larsen Chevrolet–Buick–Oldsmobile, Inc.,* 99 Idaho 675, 587 P.2d 816, 820 (1978) ("Although Peckham apparently does not dispute the issue of privity as to any implied warranties, he contends that a factual issue remains as to whether Larsen Chevrolet acted in the instant circumstances as an agent for General Motors, which would in turn give rise to privity of contract between Peckham and General Motors. We do not see the record here as indicating the exact nature of the relationship between Larsen Chevrolet and General Motors, and hence agree that such also remains a genuine issue of material fact" (internal citation omitted)).

Plaintiffs argue that they purchased their vehicles from Honda's "authorized agents," creating privity between them and the manufacturers.[70] This does not clearly appear from the complaint, however. Plaintiffs cite paragraphs 15 and 121, which state that "Honda's dealers" "are its agents for vehicle repairs," and that class members contacted "Honda and/or its authorized agents for vehicle repairs" necessitated by defects in the class vehicles.[71] This allegation is essentially a legal conclusion framed as a factual allegation, unsupported by factual allegations concerning the relationship between defendants and the dealers. Consequently, Ellis's, Gar-

---

69. FAC, ¶ 22.

70. *Id.*

71. FAC, ¶¶ 15, 121.

cia's and Zdeb's implied warranty claims must be dismissed.

### G. Whether Plaintiffs Have Stated a Claim for Breach of Written Warranty Under the Magnuson–Moss Warranty Act

█ The Magnuson–Moss Warranty Act ("Magnuson–Moss Act"), codified at 15 U.S.C. §§ 2301–2312, et seq., provides that a consumer may assert a civil cause of action to enforce the terms of an implied or express warranty. 15 U.S.C. § 2310(d) provides that any "consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract" may sue for damages and other legal and equitable relief. Breach of an obligation imposed by state law will support a claim under the Magnuson–Moss Act. *In re Sony Grand Wega*, 758 F.Supp.2d 1077, 1101 (S.D.Cal.2010) ("The Magnuson—Moss Act provides a federal cause of action for state law express and implied warranty claims"); *In re Toyota Motor Corp.*, 754 F.Supp.2d at 1188 (citing *Daugherty*, 144 Cal.App.4th at 833, 51 Cal. Rptr.3d 118 (observing that Magnuson—Moss "authorizes a civil suit by a consumer to enforce the terms of an implied or express warranty [and] 'calls for the application of state written and implied warranty law, not the creation of additional federal law'" (internal quotation marks and citation omitted))); see also *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir.2004) (noting that Magnuson–Moss borrows state law causes of action). To the extent plaintiffs have stated express and implied warranty claims, therefore, they have also stated claims under the Magnuson–Moss Act.

█ Defendants assert that the Magnuson–Moss Act only permits the exercise of federal jurisdiction over class actions where the number of named plaintiffs equals or exceeds one hundred. 15 U.S.C. § 2310(d)(3)(C) ("No claim shall be cognizable in a suit brought under [the Act] ... if the action is brought as a class action, and the number of named plaintiffs is less than one hundred"). As the complaint alleges claims on behalf of seven named plaintiffs only, defendants contend the court lacks jurisdiction to hear the Magnuson–Moss claims.

Courts interpreting the statutory provision at issue, however, have held that the requirement is satisfied when plaintiffs properly invoke jurisdiction under the Class Action Fairness Act ("CAFA"). These cases hold that where the party invoking federal jurisdiction is able to meet his or her burden of proving jurisdiction under CAFA, the absence of at least one hundred named plaintiffs does not prevent the plaintiff from asserting claims under the Magnuson–Moss Warranty Act. See *Wolph v. Acer America Corp.*, No. C 09–01314 JSW, 2009 WL 2969467, *2 (N.D.Cal. Sept. 14, 2009) ("Acer further contends that Plaintiffs are required to identify at least 100 members of the purported class in their Complaint.... [B]ecause Plaintiffs allege an alternative basis for jurisdiction under CAFA, the Court has jurisdiction to adjudicate Plaintiffs' Magnuson–Moss Act claim"); *Brothers v. Hewlett–Packard Co.*, No. C–06–02254 RMW, 2007 WL 485979, *8 (N.D.Cal. Feb. 12, 2007) (adopting various district courts' reasoning that "while the Magnuson–Moss Act provides that federal jurisdiction may be premised on allegations meeting the requirements in § 2310(d)(3), the Act alternatively permits jurisdiction 'in any court of competent jurisdiction in any State or the District of Columbia.' *Id.*; see 15 U.S.C. § 2310(d)(1)(A)," quoting *Chavis v. Fidelity Warranty Servs., Inc.*, 415 F.Supp.2d 620, 626 (D.S.C.2006) (finding that CAFA jurisdiction extends to

class actions asserting Magnuson–Moss claims that do not meet the provisions of 15 U.S.C. § 2310(1)(B))); *Stella v. LVMH Perfumes and Cosmetics*, 564 F.Supp.2d 833, 837–38 (N.D.Ill.2008) (collecting cases that have found CAFA creates an alternative basis for federal jurisdiction and declining to dismiss a Magnuson–Moss claim); see also *In re Sony Vaio Computer Notebook Trackpad Litig.*, No. 09–cv–2109 BEN (RBB), 2010 WL 4262191, *4 (S.D.Cal. Oct. 28, 2010) ("[C]ourts considering the viability of a Magnuson–Moss claim following passage of CAFA have found that CAFA jurisdiction includes class actions filed pursuant to Magnuson–Moss that fail to meet the strict jurisdictional requirements of Magnuson–Moss"); *NVIDIA GPU Litig.*, 2009 WL 4020104 at *7 n. 13 ("The Court notes that Plaintiffs satisfy the Magnuson–Moss Act's jurisdictional requirement because they allege jurisdiction based on the Class Action Fairness Act"). The court follows the weight of authority and adopts the reasoning set forth in these cases. It concludes, as a result, that it has subject matter jurisdiction to hear plaintiffs' Magnuson–Moss claims despite the fact that there are not one hundred named plaintiffs.[72]

 Defendants also contend that plaintiffs failed to comply with the Magnuson–Moss Act's exhaustion requirements before filing suit. 15 U.S.C. § 2310(a)(3) provides that where a warrantor has made available a valid informal dispute resolution (IDR) mechanism, a claimant must exhaust the IDR before filing suit. The statute, in relevant part, states that:

"One or more warrantors may establish an informal dispute settlement procedure which meets the requirements of the Commission's rules under paragraph (2). If—

(A) a warrantor establishes such a procedure,

(B) such procedure, and its implementation, meets the requirements of such rules, and

(C) he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty,

then ... a class of consumers may not proceed in a class action ... except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the named plaintiffs (upon notifying the defendant that they are named plaintiffs in a class action with respect to a warranty obligation) initially resort to [an informal dispute settlement procedure as provided for in § 2310(a)(3) ]." *Id.*, § 2310(a)(3)(C)(ii).

See also *In re Toyota Motor Corp.*, 754 F.Supp.2d at 1188 ("The [Magnuson–Moss Act] contains an explicit congressional policy statement encouraging 'warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms.' 15 U.S.C. § 2310(a)(1). Pursuant to this policy, a 'class of consumers may not proceed in a class action ... unless the named plaintiffs ... initially resort to [the warrantor's informal dispute settlement mechanism],'" citing *id.*, § 2310(a)(3)(C)(ii)). As none of the plaintiffs alleges that he or she pursued a resolution through defendants' IDR process before filing suit, defendants contend that the court lacks jurisdiction to hear the Magnuson–Moss claims.

In response, plaintiffs note that § 2310(a)(3) applies only when the warran-

---

72. Perhaps recognizing that the weight of authority is against them, defendants do not reiterate this claim in their reply.

tor *requires* that the consumer utilize the IDR process before filing suit, and that Honda's warranty states that participation in its IDR process is voluntary.[73] Defendants do not dispute this contention, but rely on the "explicit congressional policy statement" favoring informal dispute resolution procedures. *In re Toyota Motor Corp.*, 754 F.Supp.2d at 1188. The fact that Congress favors informal resolution of disputes, however, cannot contravene the clear language of the statute. See *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 732 (9th Cir.2007) ("Statutory interpretation begins with the plain meaning of the statute's language. Where the statutory language is clear and consistent with the statutory scheme at issue, the plain language of the statute is conclusive and the judicial inquiry is at an end," quoting *Botosan v. Paul McNally Realty*, 216 F.3d 827, 831 (9th Cir.2000)).

The Magnuson–Moss Act imposes three conditions to the application of § 2310(a)(3)(C)(ii), including that the warrantor "incorporate[ ] in a written warranty a *requirement* that the consumer resort to [an informal dispute settlement procedure]." If any one of the conditions is not satisfied, § 2310(a)(3)(C)(ii) does not apply. Here, defendants have clearly chosen to make their informal dispute resolution mechanism voluntary, rather than mandatory. Compare *In re Toyota Motor Corp.*, 754 F.Supp.2d at 1188–89 (requiring compliance with § 2310(a)(3)(C)(ii) because the warranty in question stated that consumers "*must* use the Dispute Resolution Program before seeking remedies pursuant to the Magnuson–Moss Act"). Consequently, a plain reading of the statute renders § 2310(a)(3)(C)(ii)'s jurisdictional bar inapplicable in this case. See also *Diaz v. Paragon Motors of Woodside, Inc.*, 424 F.Supp.2d 519, 540 (E.D.N.Y.2006) ("However, the dispute resolution provision is optional as to any MMWA claim, and accordingly plaintiff need not exhaust these procedures prior to bringing a claim under the MMWA. Accordingly, the motion for summary judgment on the MMWA claim must be addressed on the merits").[74]

Consequently, the court concludes that plaintiffs can pursue claims under the Magnuson–Moss Act if they are able successfully to plead state law express and implied warranty claims. Currently, Keegan has successfully alleged a claim under the Song–Beverly Act, and Zdeb has successfully alleged a claim under Florida's express warranty law. If plaintiffs are able to allege other express and implied

---

**73.** Honda RJN, Exh. 2 ("2006 Honda Civic Warranty") at 5 ("If you want to go to court, *we do not require you to first file a claim with the BBB AUTO LINE*. Please note that laws in some states may require that you file a claim with BBB AUTO LINE before you can proceed to a state-operated dispute resolution process or the court system. If you do not accept the decision of BBB AUTO LINE, you can still go to court" (emphasis added)); *id.*, Exh. 3 ("2007 Honda Civic Warranty") at 3 (same); see also *id.* ("The BBB AUTO LINE's purpose is to resolve disputes between vehicle manufacturers and their customers. BBB AUTO LINE's decision makers are impartial third parties who will listen to both the customer and the manufacturer and decide what can be done to resolve the disagreement").

**74.** Given the court's reliance on the plain language of the statute, it declines to address plaintiffs' argument that a futility exception applies to the Magnuson–Moss Act's exhaustion requirements. See *In re Toyota Motor Corp.*, 754 F.Supp.2d at 1189 (denying a motion to dismiss because "[a]t the pleadings stage, the Court cannot say whether attempts to comply with the informal dispute settlement procedure put in place by Toyota are futile"); *Milicevic v. Mercedes–Benz USA, LLC*, 256 F.Supp.2d 1168, 1179 (D.Nev.2003) ("Plaintiff was not obligated to follow the informal dispute resolution procedure found in Mercedes–Benz' written warranty, because it would have been futile to do so"), aff'd on different grounds, 402 F.3d 912 (9th Cir. 2005).

warranty claims in any amended complaint, the Magnuson–Moss Act will provide a cause of action for those claims as well.

### H. Whether Plaintiffs Have Stated Claims Under Various States' Consumer Protection Statutes

The eighth claim for relief alleges violations of various states' consumer protection statutes—Florida (Zdeb), Idaho (Ellis), Montana (Wright), New York (Garcia), and North Carolina (Hinkle).[75] Defendants assert that these claims must be dismissed because they fail to allege a "misrepresentation."[76]

#### 1. The Applicable Pleading Standard

■ As an initial matter, the court must determine whether to apply Rule 9(b)'s heightened standard for pleading claims sounding in fraud or the more permissive pleading standards of Rule 8(a). As noted, the Ninth Circuit has applied Rule 9(b)'s particularity requirements to CLRA and UCL claims that sound in fraud. *Kearns*, 567 F.3d at 1125. Other courts have reached a different conclusion regarding the laws at issue here. The Second Circuit, for example, has held that claims based on New York's fraud statutes are not subject to Rule 9(b)'s pleading requirements. *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir.2005) (holding that Rule 9(b) did not apply to claims asserted under § 349 of New York's Consumer Protection from Deceptive Acts and Practices Act). District courts in the Eleventh Circuit are split as to whether Rule 9(b) applies to

Florida's Deceptive and Unfair Trade Practices Act. Compare *State of Fla., Office of Atty. Gen., Dept. of Legal Affairs v. Tenet Healthcare Corp.*, 420 F.Supp.2d 1288, 1310 (S.D.Fla.2005) ("[Defendant's] insistence that [plaintiff] plead its FDUTPA claim 'with particularity' is without merit") with *Stires v. Carnival Corp.*, 243 F.Supp.2d 1313, 1322 (M.D.Fla.2002) (stating that "most courts" require that FDUTPA claims meet heightened pleading standards).

While the court acknowledges this authority, it is bound to apply Ninth Circuit precedent as set forth in *Kearns*. Although *Kearns* addressed only Rule 9(b)'s applicability to CLRA and UCL claims that sound in fraud, its reasoning is broad and applies to any claim that is " 'grounded in fraud' or 'sound[s] in fraud,' " *Id.* at 1125 (citing *Vess*, 317 F.3d at 1102–05). The *Kearns* court acknowledged that fraud is not a necessary element of claims arising under the CLRA or the UCL, but that a plaintiff could assert claims based on fraudulent conduct under either statute. *Id.* It held that in circumstances where plaintiffs allege "a unified course of fraudulent conduct and rely entirely on that conduct" as the basis of the claim, Rule 9(b) applies. *Id.* While the Second Circuit in *Pelman* declined to apply Rule 9(b) to claims under New York General Business Law § 349, as that statute did not "require proof of the same essential elements (such as reliance) as common-law fraud," 396 F.3d at 511, the Ninth Circuit clearly did not deem this relevant when the claim as a whole "sounded in fraud."[77]

---

75. See FLA. STAT. §§ 501.201 et seq.; IDAHO CODE §§ 48–601; MONT.CODE §§ 30–14–101 et seq.; N.C. GEN.STAT §§ 75–1.1 et seq.; N.Y. GEN. BUS. LAW §§ 349 et seq.

76. MTD at 10.

77. Because plaintiffs characterize their claims under these state statutes as "consumer fraud" claims (see Opp. at 16), the court

analyzes them as such. If plaintiffs' claims do not sound in fraud, however, they would not be subject to the heightened pleading requirements of Rule 9(b). See *In re Facebook PPC Advertising Litig.*, Nos. 5:09–cv–03043–JF, 5:09–cv–03519–JF, 5:09–cv–03430–JF, 2010 WL 3341062, *11 (N.D.Cal. Aug. 25, 2010) ("Rather than being premised on allegations of fraud or misrepresentations, the

Because plaintiffs' claims are based on defendants' allegedly fraudulent conduct in concealing a purported defect in the class vehicles, *Kearns* applies. Consequently, the court will analyze plaintiffs' non-California state law claims under Rule 9(b).

## 2. Whether Plaintiffs Have Successfully Stated a Claim under Their Respective State Consumer Protection Laws

Neither plaintiffs nor defendants attempt to distinguish among the consumer protection laws at issue; rather, they assert that claims under each state statute require that the same elements be pled.[78] The parties agree that plaintiffs alleged omissions or failures to disclose; they dispute whether an omission claim "requires some communicative act from which information is omitted." [79] Defendants contend that such an element is required; plaintiffs assert that it is not and that concealment

of material, relevant information in defendants' possession is sufficient to state a claim.

■ Plaintiffs have the better of this disagreement, since the laws of the relevant states liberally construe their statutes to permit claims based on omissions alone. See, e.g., *Paikai v. General Motors Corp.*, No. 07–892, 2009 WL 275761, *1, *6–7 (E.D.Cal. Feb. 25, 2009) (stating, in a case where plaintiffs alleged that GM failed to disclose a suspension defect that caused "uneven and premature tire wear ...," that "the court is not convinced that an omission alone is insufficient to state a claim under [ ]the FDUTPA"); *In re Edwards*, 233 B.R. 461, 470 (Bankr.D.Idaho 1999) ("The ICPA is remedial legislation intended to deter unfair and deceptive trade practices and is to be construed liberally.... 'An act or practice is unfair if it is shown to possess a tendency or capacity

claim boils down to a dispute over contractual interpretation, and accordingly it not subject to the pleading standards of Rule 9(b).... [A] systematic breach of contract may be an unfair business practice").

**78.** In defining the scope of their consumer protection laws, the five jurisdictions at issue rely heavily on interpretations of section 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and federal courts. See 15 U.S.C. § 45(a)(1) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful"). Florida, Idaho and Montana have specific statutory provisions that give weight to federal interpretations of the law. See FLA. STAT. § 501.204(2) (stating that "that in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act ..."); *Rohrer v. Knudson*, 349 Mont. 197, 203 P.3d 759, 764 (2009) (utilizing FTC interpretations by federal courts, as required by Montana Code Annotated § 30–14–104(1), to define unfairness under the MCPA); *United Heritage Life Ins. Co. v. First Matrix*

*Inv. Servs. Corp.*, No. CV 06–0496–S–MHW, 2009 WL 3229374, *7 (D.Idaho Sept. 30, 2009) (noting that the Idaho Consumer Protection Act provides that in construing the Act, "due consideration and great weight shall be given to the interpretation of the federal trade commission and the federal courts relating to section 5(a)(1) of the federal trade commission act ...," and that the Idaho statute "is to be construed uniformly with federal law and regulations," citing IDAHO CODE §§ 48–604, 48–618).

New York and North Carolina similarly rely strongly on federal law to guide their interpretation of their analogous state statutes. See *Hardy v. Toler*, 288 N.C. 303, 218 S.E.2d 342, 345 (1975) (observing that North Carolina statute is worded similarly to the FTC, meaning that guidance can be drawn from federal interpretation); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741, 745 (1995) (observing that NYCFA was modeled after FTC and using federal law as interpretive guide).

**79.** MTD at 10.

to deceive consumers.' It is not necessary to prove actual intent to deceive or actual deception on behalf of the defendant as long as a tendency or capacity to mislead consumers has been established," quoting *Kidwell v. Master Distributors, Inc.*, 101 Idaho 447, 615 P.2d 116, 122 (1980)); IDAHO ADMIN. PROC. ACT § 04.02.01.30 ("An omission of a material or relevant fact shall be treated with the same effect as a false, misleading, or deceptive claim or representation, when such omission, on the basis of what has been stated or implied, would have the capacity, tendency, or effect of deceiving or misleading a consumer acting reasonably under the circumstances. With reference to goods or services, this prohibition includes, but is not limited to, factors relating to the cost, construction, durability, reliability, manner or time of performance, safety, strength, condition, life expectancy, ease of operation, problems associated with repair or maintenance, availability, or the benefit to be derived from the use of the goods or services."); *Rothstein v. DaimlerChrysler Corp.*, No. 8:05CV 1126T30MSS, 2005 WL 3093573, *2 (M.D.Fla. Nov. 18, 2005) ("DCC asserts that its conduct cannot be considered 'deceptive' or 'unfair' because the express warranty implicitly informed Plaintiff that the braking components in his vehicle could fail at any time and ... did not promise Plaintiff that the braking system would last for a set number of miles. However, DCC's argument ignores Plaintiff's allegation that DCC knew the braking system was defective at the time of sale and concealed that fact from Plaintiff"); *Bildstein v. MasterCard Int'l, Inc.*, No. 03 Civ.9826I, 2005 WL 1324972, *10–11 (S.D.N.Y. June 6, 2005) (finding it "well-established" that omission-based claims under the NYCFA are appropriate "where the business alone possesses mate-

rial information that is relevant to the consumer and fails to provide this information"); *Bear Hollow, L.L.C. v. Moberk, L.L.C.*, No. 5:05CV210, 2006 WL 1642126, *6 (W.D.N.C. June 2, 2006) ("The final instance where a party negotiating at arm's length has a duty to disclose is where one party has knowledge of a latent defect in the subject matter of the negotiations of which the other party is ignorant and which it is unable to discover through reasonable diligence"); *Dalton v. Camp*, 353 N.C. 647, 548 S.E.2d 704, 711 (2001) ("A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive"); *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney Gen.*, 761 So.2d 1256, 1263 (Fla.App.2000) (stating that deception occurs if there is a " 'representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment' ").

Defendants next assert that plaintiffs have failed to plead causation with the requisite particularity, since they do not allege "how disclosure of such information could have affected Plaintiffs' negotiations with various individual dealers." [80] Defendants rely primarily on *In re Facebook PPC Advertising Litig.*, 2010 WL 3341062. There, plaintiff advertisers sued Facebook, alleging that the company had made specific representations that it would only charge for certain types of click-throughs on advertisements, but that they had been charged for many other types of clicks as well. *Id.* at *2. Plaintiffs also alleged omissions, asserting that before they contracted with Facebook, they had reviewed "policies, practices and representations set forth on Facebook's website regarding its advertising services ..." that did not dis-

---

**80.** Reply at 14. Defendants assert that plaintiffs "concede" that causation is an element of

consumer fraud claims based on non-California law. (*Id.* (citing Opp. at 16).)

close the charges about which they complained. *Id.* at *6. The court concluded that allegations at this level of generality were too nonspecific to survive Rule 9(b), stating: "Plaintiffs should ... be able to identify with particularity at least the specific policies and representations that they reviewed." *Id.*

Defendants' reliance on *Facebook* is somewhat misplaced, as that court's requirement that plaintiffs "identify with particularity" the specific policies and representations they reviewed concerns plaintiffs' standing to bring a private enforcement action under the UCL after Proposition 64, not whether they had adequately alleged causation. See *id.* at *9 (discussing Proposition 64 and noting that California Supreme Court's holding that the "language ['as a result of' in the proposition] imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong," quoting *In re Tobacco II Cases*, 46 Cal.4th 298, 326, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009)); see also *id.* ("[T]here is no doubt that reliance is the causal mechanism of fraud").

*In re Tobacco II*, on which the *Facebook* court relied for this proposition, did indeed hold that proving reliance was necessary to prevail on a claim under the UCL's fraud prong. The Tobacco II Court also noted, however, that "[a] plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct." *Id.* at 326 (quoting *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1110–11, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993) (Kennard, J., concurring in part and dissenting in part)). The Court further observed that "[a] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Id.* at 327, 93 Cal.Rptr.3d 559, 207 P.3d 20 (quoting *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 976–977, 64 Cal.Rptr.2d 843, 938 P.2d 903 (1997)); see also *id.* ("Nor does a plaintiff need to demonstrate individualized reliance on specific misrepresentations to satisfy the reliance requirement").

Consequently, while plaintiffs concede that "causation" is an element of a claim under the state consumer protection statutes at issue, defendants conflate causation with the California Supreme Court's determination that actual reliance must be pled and proved to prevail on a claim under the "fraud" prong of California's UCL. Defendants seek to import this holding regarding the reliance needed to have standing under the UCL into the laws of a number of other states without citing any authority suggesting that this is appropriate. Since these states have patterned their consumer protection laws after the FTC Act, it is most appropriate to look to that statute's definition of the elements of a claim. The standard for claims under the FTC Act is whether a misrepresentation or omission is "likely to mislead consumers acting reasonably under the circumstances." See *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir.2006) ("An act or practice is deceptive if first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material"); see also *FTC v. Stefanchik*, 559 F.3d 924 (9th Cir.2009) (quoting *Cyberspace.Com*). Compare *In re Tobacco II*, 46 Cal.4th at 326, 93 Cal.Rptr.3d 559, 207 P.3d 20 ("[a] plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff 'in all reasonable

probability' would not have engaged in the injury-producing conduct").

Even were it appropriate to employ the California standard, moreover, plaintiffs have successfully pled that Honda's alleged omission was material. As the California Supreme Court held in *Tobacco II*, the fact that the representation was material gives rise to "[a] presumption, or at least an inference, of reliance...." See *In re Tobacco II*, 46 Cal.4th at 327, 93 Cal. Rptr.3d 559, 207 P.3d 20. Consequently, the court concludes that plaintiffs have adequately pled causation under the various state consumer protection statutes at issue.

■ The court agrees with defendants, however, that plaintiffs must comply with Rule 9(b) because the claims sound in fraud. Plaintiffs meet this burden by pleading that they purchased class vehicles with the understanding that they would function as warranted when sold, that defendants had specific information about a defect in the cars that affected their ability to function as warranted, and that they did not disclose that information to plaintiffs.[81] Plaintiffs also plead specific interactions with dealers over the time they owned the vehicles, repeatedly indicating that those dealers had multiple opportunities to disclose defects and problems with the rear suspension and/or tires, and failed to do so.[82] For example, in February 2008, plaintiff Garcia visited his Honda agent to replace his tires after only 13,000 miles. While the dealer observed that the tires were "feathered," there was no mention of the suspension defect.[83] Plaintiff Zdeb visited his authorized Honda dealership to obtain new tires after 27,000 miles, but none of the dealer's employees discussed the suspension defect with him.[84] Two of the plaintiffs (Hinkle and Kolstad) purchased their vehicles after issuance of the 2008 TSB, yet Honda's dealers failed to disclose any information regarding the possible defect.[85]

Consequently, the court concludes that plaintiffs have successfully stated a claim under the consumer protection laws of the various states.

### III. CONCLUSION

For the reasons stated, the court denies defendants' motion to dismiss the first and second claims for relief, the third claim for relief as asserted by Keegan, the fourth claim for relief as asserted by Keegan and Zdeb, the fifth claim for relief as asserted

---

81. FAC, ¶ 209 (incorporating prior allegations into plaintiffs' violation of consumer protection law statutes, including references to Honda warranties).

82. See also, e.g., FAC, ¶ 25, 26, 33, 42–43, 46, 55, 85.

83. *Id.*, ¶ 24.

84. *Id.*, ¶ 83.

85. *Id.*, ¶¶ 60, 68. Although defendants complain that plaintiffs allege defendants' knowledge of the defect at the time they purchased their vehicles only on "information and belief," *Twombly's* "plausibility standard ... does not prevent a plaintiff from 'pleading facts alleged "upon information and belief" ' where the facts are peculiarly within the possession and control of the defendant, ... or

where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir.2010). Plaintiffs identify the sources of defendants' purported knowledge—pre-release testing data, early consumer complaints and testing conducted in response to early complaints, and assert that defendants took no steps to notify consumers until they issued the TSB in January 2008. Even then, plaintiffs contend, Honda provided information regarding the alleged defect and a modification to address it only to selected customers who persistently complained. These facts give rise to a plausible inference that defendants did not disclose the defect to plaintiffs at the time they purchased their vehicles.

by Keegan, the sixth claim for relief as asserted by Zdeb, and the eighth claim for relief as asserted by all non-California plaintiffs. Defendants' motion to dismiss the fifth claim for relief as asserted by Kolstad and Zdeb, and the seventh claim for relief as asserted by Garcia, Ellis, and Zdeb, is granted. Plaintiffs may file an amended complaint within twenty (20) days of this order.