Filed 8/12/14  Clark v. Bank of America CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CRAIG CLARK, | B248593 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC056135) |
| v. | |
| BMW OF NORTH AMERICA, LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles, Laura Matz, Judge.  Affirmed.

Krohn & Moss, Jennifer Basola and John Barker for Plaintiff and Appellant.

Rogan Lehrman, Kate S. Lehrman, Robert A. Philipson, for Defendant and Respondent.

_____

Plaintiff and appellant Craig Clark appeals from the judgment entered in favor of defendant and respondent BMW of North America, LLC (BMW). Clark challenges the trial court's order granting a directed verdict in favor of BMW with respect to his causes of action for breach of the implied warranty of merchantability. He also contends the trial court committed prejudicial instructional error in regard to his breach of written warranty causes of action. We hold that the directed verdict was properly granted as to the implied warranty claims, and the instructional error was nonprejudicial under the reasoning of *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 (*Soule*).

## PROCEDURAL BACKGROUND

Clark leased a new 2006 BMW 330i (vehicle) from Pacific BMW (dealership). BMW expressly warranted the vehicle against defects in materials or workmanship, agreeing to repair or replace any defective parts.

Clark decided to stop driving the vehicle in January of 2011. On January 13, 2011, Clark revoked acceptance of the vehicle because it had "defects and non-conformities . . . [that] constitute[d] a substantial impairment of the use, value and/or safety of the vehicle." [1]

Clark filed a complaint for breach of written warranty under the state Song–Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.) (Song–Beverly) and the federal Magnuson–Moss Warranty Act (15 U.S.C. § 2301 et seq.) (Magnuson–Moss), and for breach of the implied warranty of merchantability under both Song–Beverly and Magnuson–Moss, alleging that BMW failed to repair certain defects after a reasonable number of attempts. He sought various remedies, including restitution of the purchase price, damages, and a civil penalty.

---

[1] Clark drove the vehicle an additional 6,000 miles between January 2011, and the start of trial in February 2013.

2

The trial court granted BMW's motion for directed verdict on the implied warranty causes of action, finding that Clark had not presented evidence that the vehicle was defective or unsuitable for its intended use. On Clark's claims for breach of the written warranty, the court instructed, on BMW's request and over Clark's objection, that Clark was required to prove a "substantial impairment" of the vehicle's use, value, or safety for recovery, as set forth in CACI No. 3204. The jury was also presented with a special verdict form requiring Clark to prove the defect substantially impaired the vehicle's use, value, or safety. It returned a verdict in favor of BMW by a vote of 11-1. Clark filed a timely notice of appeal.

## FACTUAL BACKGROUND

Clark leased the vehicle from the dealership in June 2006. BMW provided a written limited warranty for a period of the earlier of either 48 months or 50,000 miles. The limited warranty stated that BMW "warrants 2006 U.S. specification vehicles . . . against defects in materials or workmanship . . . ." BMW agreed to repair or replace any such defective part within a reasonable time as long as Clark presented the vehicle to an authorized service center upon the discovery of the defect. Clark presented the vehicle to the dealership for repair on several occasions, as set forth below.

Clark took the vehicle to the dealership on November 6, 2006, because the light bulb out indicator and park lamp malfunction message had illuminated, the driver's side inside molding was not sitting flush with the door panel, there was a delay in shifting from first to second gear and sometimes in shifting from second to third gear,[2] and the steering column made squeaking noises when turning. The dealership replaced the light bulb and the molding. Clark was satisfied with these two repairs. The dealership found no fault codes relating to the transmission. The dealership checked the steering wheel for squeaking noises both on and off the ground, with the engine on and with the engine off,

---

[2] The car had an automatic transmission.

3

but no noises were detected. The repair order recommended that Clark test-drive the vehicle with the shop foreman, but he did not do so. Clark stated that the delay in shifting and the squeaking in the steering wheel were ongoing concerns for him. He did not recall experiencing any issues with the transmission after leaving the dealership, but he stated that the issue was intermittent, and that the delay in shifting varied in degree.

On October 17, 2007, Clark brought the vehicle to the dealership for routine maintenance. The dealership replaced the wiper blades, which were worn. Clark expressed no problems with the operation of the vehicle.

On April 8, 2008, Clark brought the vehicle to the dealership for maintenance, complaining of a lifter "ticking" noise, a delay in shifting from second to third gear, lack of engagement in neutral, the steering column locking, and squeaking noises when turning the steering wheel. The technician could not verify the lifter ticking noise, but bled all the fluid out of the lifters. Clark did not experience the lifter ticking noises over the next year. The technician road-tested the vehicle on the streets and freeway, but could not duplicate the delay in shifting or lack of engagement in neutral, and found no fault codes stored in the vehicle's computer. To address the issue of the steering column locking, the dealership reprogrammed the software. The technician also lubricated the steering column, and Clark did not complain of the steering wheel squeaking again.

Clark presented the vehicle to the dealership on October 6, 2008, because the fog lamp had burnt out and the engine "idled rough." He did not complain of lifter ticking noises on this occasion. The dealership replaced the fog lamp. The technician road-tested the vehicle and could not duplicate the rough idle. No fault codes were stored in the computer.

On March 16, 2009, Clark brought the vehicle to the dealership, again complaining of lifter ticking noises. The dealership replaced the cylinder head, and Clark never heard the noises again. Clark also complained that the engine was running rough and the starter was making grinding noises, but the technician was unable to duplicate the complaints, and no fault codes were stored in the computer. Clark complained that the speaker was unclear. The technician replaced the speaker. Clark said that the vehicle

4

nearly stalled at an intersection. The technician interrogated the computer system and determined that Clark was not driving the vehicle as recommended, which had a negative effect on the battery power. The dealership made recommendations as to how to improve the battery charge.

Clark purchased the vehicle in May or June 2009.

On August 31, 2009, Clark brought the vehicle to the dealership for issues with the steering wheel locking. The dealership replaced the steering column. There was never an issue with the steering wheel locking again. Clark never had the vehicle towed due to the steering wheel issue. He had to wait a while to start the car on several occasions, but did not take the car to the dealership until August 31, 2009. Clark also reported noises related to the idler pulley, which the dealership replaced. He complained of a grinding noise in the engine, but the technician was unable to verify the complaint. Clark claimed that the engine was running rough, but the complaint could not be duplicated, and there were no fault codes stored.

On September 29, 2009, Clark brought the vehicle to the service center complaining that an air vacuum was leaking in the engine, he heard grinding or rotating noises from the wheel area, the engine cover was loose and rattled, and he heard a grinding noise from the starter when starting the vehicle. The technician was unable to verify the air vacuum leak or noises from the wheel area. The engine cover valve was secure. With respect to the starter, the intake box was loose, causing a rattling noise. After it was secured the noise ceased.

On October 6, 2009, Clark complained that the starter was making a grinding noise when he started the vehicle. The dealership replaced the starter, and the problem never occurred again. He also complained that the RPM needle vibrated when driving, but the dealership could not verify the complaint.

On December 30, 2009, Clark complained that the engine was running rough, the front passenger wheel was squeaking, he heard an air leak in the engine area, and the low brake fluid light had illuminated. The dealership had not previously been able to identify any problems with the engine. The technician diagnosed the right motor mount as

5

"weak," which caused a rattling noise. He replaced the right motor mount. There were no fault codes stored relating to the engine. The technician replaced the rear sensor to address the front passenger wheel squeaking. The technician was unable to verify Clark's complaint that there was some sort of air leak in the engine. The technician identified worn brake pads as causing the low fluid, and replaced the brake pads.

On February 9, 2010, Clark brought the vehicle to the dealership because the front passenger door would not unlock with the remote or the dash button, and he heard an "air type" engine noise. The dealership replaced both front actuators and the left rear actuator to resolve the locking issue, but was unable to verify the engine noise.

On June 10, 2010, three days before the warranty expired, Clark brought the vehicle to the dealership, complaining about a delay in shifting, air and other noises coming from the engine, and a malfunctioning trunk door. The dealership replaced the trunk dampeners, and they did not malfunction again. Clark reported that he had difficulty starting the vehicle in the morning. The technician replaced the vehicle's battery. The technician test-drove the vehicle and inspected the transmission, but could find no problems with the shifting. The only engine noise the technician could duplicate was the air noise, which he found in an exemplar vehicle as well. The engine was operating within specifications.

On November 10, 2010, Clark brought the vehicle to the dealership because he had to jump start the battery, the driver's side door did not unlock with the comfort remote when he pulled the handle, and he heard a vibration from the engine. The dealership replaced the battery, and one of the comfort remotes, which was faulty. The technician was unable to duplicate the vibration noise.

On December 10, 2010, Clark brought the vehicle to the dealership complaining that the vehicle jerked when the gears shifted, the driver's side door did not unlock with the comfort remote when he pulled the handle, and RPMs would drop at stoplights. The dealership found a leak in the transmission wiring harness sleeve and replaced it, free of charge. The dealership also replaced a faulty key.

In January 2011, the vehicle failed to accelerate and made a noise for approximately 10 seconds when Clark drove it up an incline in a parking structure. Clark parked the car, had dinner with his wife, and then drove the car without incident. He did not hear the noise again and no warning lights illuminated. The dealership inspected the transmission on January 4, 2011, and test-drove the vehicle. The technician found no problems.

Up until this point, Clark used the vehicle daily to go to work, run errands, and to take pleasure rides through Malibu canyon and on Mulholland Drive. The vehicle never stalled, there were no fluid leaks, no electrical problems, or problems with the engine. The technicians never found a problem with the transmission, and the transmission never failed. The technicians never found a defect in the vehicle that would cause it to run rough.

Clark filed a claim against BMW with the Better Business Bureau. The parties participated in an arbitration. The arbitrator denied Clark's request that BMW repurchase the vehicle.

Clark's automotive service expert, Jackie Winters, testified that he inspected and test drove the vehicle on February 1, 2012. Winters experienced a delay in shifting from second to third gear, a harsh downshift, a vibration in the engine, and a squeaking noise when the vehicle was parked and the steering wheel was turned all the way to the right or left. Winters testified that the vibration and shifting were not what he would expect for the vehicle. He was unable to record the vibration or shifting issues, but did make an audio recording of the wheel squeaking when the vehicle was in park.

On cross-examination, Winters testified that he detected no lifter ticking noises, no fluid leeks, no problems with steering wheel locking, no squeaking of the steering wheel while driving, no grinding noises from the starter, no delay in shifting from first to second gears, and no problems with the motor mount, door locks, or battery. He stated that he found no stored fault codes, though it would be possible to have a defect in the engine despite an absence of fault codes. He did not compare the shifting to the specifications for the vehicle. Winters did not experience any steering noises while

driving and did not encounter any problems with the vehicle's steering. He opined that a motor mount would not cause a rough idle. Winters could not recall working on a vehicle with the same engine and transmission, and did not compare Clark's vehicle with another vehicle of the same make and model.

Shane Zapcic, BMW's Regional After Sale Development Manager for the Western Region, testified that he surveyed Clark for customer satisfaction on November 9, 2009, approximately five months after Clark purchased the vehicle. Clark rated his service experience as a "100" on a scale of 1 to 5. He stated that all repairs had been completed and that he would recommend the dealership to a family member or close friend.

Zapcic was responsible for denying Clark's request that the dealership buy back his vehicle. Zapcic concluded that buyback was not appropriate because all repairs had been made in a reasonable and timely manner. Clark was never denied warranty coverage, and all repairs were made free of charge.

Randy Rodriguez, a technician at the dealership, worked on the vehicle on November 10, 2010, December 10, 2010, and January 4, 2011. He inspected and test-drove the vehicle and experienced no vibrations, noises, or problems with the shifting. There were no fault codes stored in the vehicle's computer. He found a minor oil leak from the mechatronic sleeve during the December 10, 2010 visit, and replaced the sleeve. Rodriguez explained that the mechatronic sleeve carries the wiring harness for the control unit into the transmission and seals the transmission. The leak did not cause any performance problems in the transmission.

Shawn Kim, the dealership's shop foreman, worked on the vehicle on November 6, 2006, prior to becoming the foreman, and saw the vehicle on the June 10, 2010 and January 4, 2011 service visits. He found no problems with the engine or transmission, and no codes were stored concerning either complaint. The transmission and engine were operating normally. Kim explained to Clark that the transmission in the vehicle varied from the transmissions in Clark's previous vehicles. The transmission is designed for maximum efficiency, and shifts to the highest appropriate gear as quickly and for as long

8

as possible.  The driver may experience a lag depending on how quickly and deeply the gas pedal is compressed, but this is normal.

Gary Barsegyan, a Regional Technical Engineer for BMW, explained that the vehicle has a separate control unit for each system in the vehicle.  The control units monitor the systems constantly and communicate with one another if there is a problem with one of the systems.  When problems occur, fault codes, which describe the problem, are set and stored.  There are thousands of fault codes for the vehicle.  Barsegyan reviewed the service history of the vehicle and discovered no fault codes pertaining to the reported rough idle, engine noise, or shifting delays.

Barsegyan explained that the vehicle's transmission is a six-speed electrohydraulic transmission, which will shift differently depending on whether it is being driven aggressively or conservatively.  If there is a delay in shifting outside of specifications, a warning light for the transmission will illuminate, and fault codes will be generated.  Barsegyan inspected and test-drove the vehicle on March 26, 2012, under a variety of conditions, and made a video recording.  He did not experience a rough idle or a delay in shifting.  Barsegyan testified that the small leak in the mechatronic sleeve repaired on December 10, 2010, was not significant enough to cause the reported shifting issues, and even if it had been, warning lights would have illuminated and fault codes would have been generated.  Barsegyan testified that when he test-drove the vehicle, well after expiration of the warranty, it operated normally.

**DISCUSSION**

*Implied Warranty of Merchantability Causes of Action*

A trial court may grant a motion for nonsuit or directed verdict only if it determines that, as a matter of law, the evidence presented by a plaintiff is insufficient to permit a jury to find in his or her favor.  (*Nally v. Grace Community Church of the Valley* (1988) 47 Cal.3d 278, 291.)  In making this determination, "the court may not weigh the

9

evidence or consider the credibility of witnesses." (*Ibid*.) It must accept as true the evidence most favorable to the plaintiff, indulging every legitimate inference that may be drawn from the evidence, and disregarding conflicting evidence. (*Ibid*.)

Appellate review of an order granting a directed verdict is subject to de novo review. (*Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 669 (*Hernandez*).) "In reviewing the denial of a motion for nonsuit or directed verdict, appellate courts, like trial courts, must evaluate the evidence in the light most favorable to the plaintiff. [Citation.]" (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 263.) We affirm a trial court's grant of directed verdict "if a judgment for the defendant is required as a matter of law, after resolving all presumptions, inferences and doubts in favor of the plaintiff. [Citation.]" (*Hernandez*, *supra*, at p. 669.)

"The Magnuson–Moss Warranty Act provides a right of action for a consumer who is damaged by a warrantor's failure to comply with an implied warranty that arises under state law. (15 U.S.C. §§ 2301(7), 2310(d)(1).) In California, an implied warranty of merchantability arises under the Song–Beverly Consumer Warranty Act: 'Unless disclaimed in the manner prescribed by this chapter, every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable.' (Civ. Code, § 1792.) 'The "[i]mplied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: [¶] (1) Pass without objection in the trade under the contract description. [¶] (2) Are fit for the ordinary purposes for which such goods are used. . . .' (Civ. Code, § 1791.1, subd. (a).)" (*Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 24 (*Isip*).)

"Unlike express warranties, which are basically contractual in nature, the implied warranty of merchantability arises by operation of law. [Citation.] It does not 'impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality.' [Citations.]" (*American Suzuki Motor Corp. v. Superior Court* (1995) 37 Cal.App.4th 1291, 1295-1296, disapproved on other grounds in *Linder v. Thrifty Oil Co*. (2000) 23 Cal.4th 429, 442-443.) "'The core test of

10

merchantability is fitness for the ordinary purpose for which such goods are used. [Citation.]' [Citations.]" (*Isip*, *supra*, 155 Cal.App.4th at p. 26.) Fitness is established if the product "is 'in safe condition and substantially free of defects . . . .'" (*Id.* at p. 27.) "Thus, a new car need not 'be perfect in every detail'; rather, its implied merchantability 'requires only that a vehicle be reasonably suited for ordinary use.' (*Keegan v. American Honda Motor Co., Inc.* (C.D. Cal. 2012) 838 F.Supp.2d 929, 945 [(*Keegan*)].)" (*Brand v. Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1546.) Although we have held that the fact that a vehicle "provides transportation from point A to point B" is not always sufficient to establish that the alleged defects do not violate the implied warranty of merchantability (*Isip*, *supra*, at p. 27), the vehicle's operability is an important consideration. "Since cars are designed to provide transportation . . . where a car can provide safe, reliable transportation, it is generally considered merchantable." (*Keegan, supra,* 838 F.Supp.2d at p. 945, quoting *Carlson v. Gen. Motors Corp.* (4th Cir. 1989) 883 F.2d 287, 297.)

The implied warranty of merchantability covers a period of up to one year. (Civ. Code, § 1791.1, subd. (c).) However, discovery and reporting of latent defects which existed at the time of purchase but did not present themselves until after the one-year period is not restricted to the one-year implied warranty period. (*Mexia v. Rinker Boat Co., Inc.* (2009) 174 Cal.App.4th 1297, 1304-1305.) "In the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." (*Id.* at p. 1305.)

After presentation of evidence, BMW moved for directed verdict as to Clark's causes of action for breach of the implied warranty of merchantability under Magnuson–Moss and Song–Beverly. Clark's counsel argued that the ten-second loss of power in the parking lot, which occurred after expiration of BMW's express 48 month warranty, was circumstantial evidence that a latent defect existed during the one-year period of the implied warranty of merchantability. The trial court observed, "In seven years a ten-second problem just doesn't seem to me to be a [breach of the] warranty of merchantability that's not fit for the purpose that it was purchased for and that it doesn't

11

meet minimum standards of quality." The trial court later ruled, "I am going to grant the motion. The only alleged defect is that there was a delay in shifting from first to second and at times from second to third gears, not that it didn't work . . . [¶] So it's clear to me that it was merchantable during the first year and . . . would pass in the trade . . ." Clark challenges the trial court's ruling.

Preliminarily, we reject BMW's argument that Clark is barred by the statute of limitations. BMW failed to raise the issue below, and we will not consider it on appeal. (*Berendsen v. McIver* (1954) 126 Cal.App.2d 347, 351 [defendant must raise statute of limitations by demurrer or answer or it is waived].)

We conclude that the trial court properly granted the motion for directed verdict on the implied warranty causes of action. Clark introduced no substantial evidence to establish that the vehicle did not provide safe, reliable transportation. He testified that he drove the vehicle regularly, and used it as transportation to work and to run errands. Clark expressed no concerns about the safety of the vehicle and offered no proof that the vehicle was unsafe. He testified to a single instance in which the car lost power for 10 seconds on an incline in a parking lot, after the four-year written warranty on the vehicle had expired, and well after the one-year period of the implied warranty of merchantability. He produced no other evidence indicating that the operability of the vehicle was impaired. This case is readily distinguishable from *Isip*, *supra*, 155 Cal.App.4th at p. 27, where we concluded that "[a] vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose." Viewing the evidence in the light most favorable to Clark, we conclude that a judgment in favor of BMW is required as a matter of law. The evidence shows that the vehicle provided regular, reliable transportation, and that the issues complained of did not impact Clark's ability to use the vehicle for its ordinary purpose.

*Magnuson–Moss Written Warranty Cause of Action*

Following the presentation of evidence, Clark proposed special instruction No. 8 on breach of the written warranty under Magnuson–Moss. The proposed instruction stated:

"Craig Clark claims that he was harmed by BMW of North America, LLC's violation of its Written Warranty under the Magnuson–Moss Warranty Act. To establish this claim, Craig Clark must prove all of the following:

"1. That BMW of North America, LLC provided Craig Clark with a written warranty for the vehicle;

"2. That Craig Clark delivered the vehicle to BMW of North America, LLC or its authorized repair facilities to repair a defect in the vehicle; and

"3. That BMW of North America, LLC or its authorized repair facilities failed or refused to repair the vehicle after a reasonable number of attempts, or after being afforded a reasonable opportunity to do so."

Clark also proposed special instruction No. 14, based on Commercial Code section 2714, stating that the measure of damages for such a breach of written warranty was "[t]he difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

BMW's counsel argued that CACI No. 3204, which requires substantial impairment of the use, value, or safety of the vehicle, be given with respect to Clark's breach of written warranty claims *under both* Magnuson-Moss and Song-Beverly.

Clark's counsel argued that separate instructions and verdict forms were needed for the Magnuson–Moss and Song–Beverly causes of action because the two have differing burdens of proof: Song–Beverly requires proof of "substantial impairment" to the vehicle, whereas Magnuson–Moss does not. Instructing the jury with CACI No. 3204 with respect to both causes of action would restrict Clark to recovery only if the vehicle was "substantially impaired," even though the warranty was not restricted to substantial

13

impairment for coverage. Counsel further explained that a lesser recovery was available under Magnuson–Moss.

The trial court refused both of Clark's proposed special instructions, electing to give CACI No. 3204.[3]  The jury returned a special verdict in favor of BMW, finding that the vehicle was not substantially impaired in use, value, or safety.

### Magnuson–Moss and Song–Beverly Have Different Elements and Provide for Separate Remedies

Clark contends the trial court erred by failing to separately instruct the jury on his cause of action for breach of written warranty under Magnuson–Moss, or to provide the jury with an appropriate special verdict form, thereby restricting him to recovery under Song–Beverly.  We agree with Clark that the trial court failed to properly instruct the jury under Magnuson–Moss, but conclude that the error was harmless.

Our colleagues in Division Three of the Second District recently held in *Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1330-1333 (*Orichian*), that Magnuson–Moss and Song–Beverly create separate remedies for breach of written or express warranties, with differing elements of proof.  Magnuson–Moss regulates warranties for products distributed in interstate commerce.  It does not supplant state consumer product warranties law, but rather supplements state law by providing additional protections to consumers.  (*Ibid.*)  "'Magnuson–Moss "calls for the application of state written and implied warranty law, not the creation of additional federal law,"

---

[3] The jury was instructed as follows pursuant to CACI No. 3204 ("Substantially Impaired" Explained) as follows:  "In deciding whether a reasonable person would believe that the vehicle's defect, if any, substantially impaired the vehicle's use, value, or safety, you may consider, among other factors, the following: (a) The nature of the defect; (b) The cost and length of time required for repair; (c) Whether past repair attempts have been successful; (d) The degree to which the vehicle could be used while awaiting repair; (e) The availability and cost of comparable transportation during the repairs."

14

except in specific instances in which it expressly prescribes a regulating rule.' [Citation.]" (*Id.* at p. 1330.)

The Commercial Code and Song–Beverly, commonly known as the "Lemon Law," govern express or written warranties in California. (*Orichian*, *supra*, 226 Cal.App.4th at p. 1331.) Song–Beverly requires a plaintiff to prove that a defect substantially impairs the use, value, or safety of a vehicle to establish breach of an express or written warranty, whereas the Commercial Code does not. (*Orichian*, *supra*, at p. 1331, fn. 9.) The remedies provided also differ. Under Song–Beverly, a manufacturer must replace the vehicle or make restitution to the buyer if it is unable to repair a new vehicle in conformance with an express warranty within a reasonable number of attempts. (Civ. Code, § 1793.2, subd. (d).) Pursuant to the Commercial Code, "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." (Com. Code, § 2714, subd. (2).) "In a proper case any incidental and consequential damages under Section 2715 also may be recovered." (*Id.* at subd. (3).)

Song–Beverly specifically states that its remedies "are cumulative and shall not be construed as restricting any remedy that is otherwise available . . ." (Civ. Code, § 1790.4.) Our Supreme Court has held that Song–Beverly "makes clear its pro-consumer remedies are in addition to those available to a consumer pursuant to the Commercial Code (Civ. Code, § 1790.3). . . ." (*Murillo v. Fleetwood Enterprises, Inc*. (1998) 17 Cal.4th 985, 990.) Because Song–Beverly requires a higher burden of proof than the Commercial Code, and affords a different measure of recovery, we apply the relevant provisions of the Commercial Code with respect to express or written warranties under Magnuson–Moss. (*Orichian*, *supra*, 226 Cal.App.4th at p. 1332.)

15

**Refusal to Instruct on Breach of Written Warranty Under Magnuson–Moss and the Commercial Code Is Error**

A party is entitled to have the jury instructed on each viable legal theory supported by substantial evidence if the party requests a proper instruction. (*Soule, supra,* 8 Cal.4th at p. 572.) "We review de novo the question of whether the trial court's instructions to the jury were correct. [Citations.] In evaluating the contention that an instruction was improperly refused, 'we view the evidence in the light most favorable to the appellant. In such cases, we assume that the jury might have believed the evidence upon which the instruction favorable to the appellant was predicated.' [Citations.]" (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 526.)

Although a court may refuse a proposed instruction that is "erroneous, misleading, or otherwise improper . . . if the inaccuracy is minor and easy to correct and the failure to do so would leave the jury inadequately instructed on an important issue[,]" such refusal is error. (*Orichian*, *supra*, 226 Cal.App.4th at p. 1333.)

"The essential elements of a cause of action under the Commercial Code for breach of an express warranty to repair defects are (1) an express warranty [Citation] to repair defects given in connection with the sale of goods; (2) the existence of a defect covered by the warranty; (3) the buyer's notice to the seller of such a defect within a reasonable time after its discovery [Citation]; (4) the seller's failure to repair the defect in compliance with the warranty; and (5) resulting damages." (*Orichian*, *supra*, 226 Cal.App.4th at pp. 1333-1334.) "A cause of action for breach of written warranty under Magnuson–Moss also requires a written warranty as defined in the federal act. . . ." (*Id*. at p. 1334.)

Here, Clark's proposed instructions were identical to the proposed instructions in *Orichian*, *supra*, 226 Cal.App.4th at p. 1329. We agree with the *Orichian* court that the

16

instructions covered the elements in dispute,[4] "although some modifications would be appropriate to ensure that each of the elements that we have set forth is clearly stated, including the requirements of a defect covered by the warranty and defendant's failure to repair such a defect." (*Id*. at p. 1334, italics omitted.) Because these inaccuracies are minor and failure to give the instructions would leave the jury inadequately instructed on an important issue, the trial court erred in refusing the instructions.

**The Error Was Not Prejudicial**

The existence of instructional error does not end the discussion, as our Supreme Court has established that instructional error in a civil case is not per se reversible. "A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. (*People v. Watson* (1956) 46 Cal.2d 818, 835.)" (*Soule*, *supra*, 8 Cal.4th at p. 574.) "The word 'misdirection' logically includes every kind of instructional error. It seems manifest that incorrect, ambiguous, conflicting, or wrongly omitted instructions may equally 'misdirect' the jury's deliberations. Nothing in the language or history of article VI, section 13 suggests that its requirement of actual prejudice, determined by reference to 'the entire cause, including the evidence,' applies to some forms of 'misdirection,' but not others." (*Id.* at p. 579.)

"The refusal of a proper instruction is prejudicial error only if '"it seems probable" that the error "prejudicially affected the verdict." [Citations.]' [Citation.] '[W]hen deciding whether an error of instructional omission was prejudicial, the court must also

---

[4] As in *Orichian*, *supra*, at p. 1333-1334, it appears to be undisputed that Clark's notice to BMW of the alleged defects was given within a reasonable time of their discovery.

evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled. [Fn. omitted.]' [Citation.]" (*Faigin v. Signature Group Holdings, Inc*. (2012) 211 Cal.App.4th 726, 750, quoting *Soule*, *supra*, 8 Cal.4th at pp. 580-581.)

Most significantly for purposes of this appeal, *Soule* rejects the theory that "the erroneous denial of correct specific instructions covering a civil litigant's supportable 'theory of the case' is 'inherently' prejudicial." (*Soule*, *supra*, 8 Cal.4th at p. 574.) "Cases that automatically applied that theory without reference to the actual record 'lost sight of the principal purpose and significance of . . . California's constitutional provision explicitly addressing the matter of reversible error. . . .' [Citation.]" (*Id.* at p. 579.) There is no structural error requiring reversal based on denial of a proper instruction "if a civil litigant was permitted to introduce evidence, cross-examine witnesses, and present argument before a fairly selected jury that rendered its honest verdict on the trial record. . . ." (*Ibid.*)

Our review of the record leads to the conclusion that it does not seem probable that the denial of Clark's proposed instruction prejudicially affected the verdict. Clark "was permitted to introduce evidence, cross-examine witnesses, and present argument before a fairly selected jury" in this case. (See *Soule*, *supra*, 8 Cal.4th at p. 579.) While the precise theory of Clark's case under Magnuson–Moss was not presented to the jury for decision, *Soule* holds that we still must examine the entire record to determine if it seems probable that Clark was prejudiced. (*Id.* at p. 580.) Given the state of the record, we conclude Clark has not carried his burden of demonstrating prejudice.

We focus on the key elements under Magnuson–Moss as contained in Clark's proposed instruction — whether BMW "failed or refused to repair the vehicle after a reasonable number of attempts, or after being afforded a reasonable opportunity to do so." As counsel for Clark argued to the jury at the conclusion of the trial, "What this case comes down to is who you believe. That's what it comes down to." Although answering a question in the verdict different from that it would have answered under Magnuson–Moss, it is apparent the jury by a vote of 11-1 believed BMW's witnesses and rejected

the testimony of Clark and his expert. This conclusion is consistent with the finding of the arbitrator, who rejected Clark's attempt to rescind the purchase based upon defects.

Moreover, the evidence presented by BMW convincingly demonstrates that BMW responded promptly to each of Clark's complaints and never refused to make a repair within a reasonable time of the vehicle being presented to its service center. Clark's own testimony evidences that the dealership repaired the vast majority of the defects the first time that the vehicle was presented to the dealership for the defect in question. Other complaints were resolved for a significant period of time after the first visit, and permanently resolved following a second servicing. The dealership replaced the vehicle's battery after several years. When the new battery failed, the dealership replaced it as well. The technician was unable to duplicate the lifter ticking noise by test-driving the vehicle when Clark first complained of the problem, but bled the fluid out of the lifters. Clark did not hear the noise again for approximately a year, and did not complain of the noise during his next service visit. When he began to hear a lifter ticking noise a second time, the technician replaced the cylinder head, and Clark never heard the noise again. The technician was also unable to duplicate the starter noise when Clark initially complained of it. When Clark complained about the noise on a subsequent visit, the technician tightened the intake box, which had been causing a rattling noise. Shortly thereafter, the dealership replaced the starter, and Clark never complained about it again. Similarly, when Clark first complained about the steering wheel locking, the technician reprogrammed the software, eliminating the problem. When Clark experienced a problem with steering wheel locking approximately one year later, the technician replaced the steering column, and the issue never occurred again.

The only issues Clark complained of that were not resolved to his satisfaction were the engine running rough and the delay in shifting. The dealership was never able to verify either issue through road-testing, and it is undisputed that no fault codes were stored in the car's computer with respect to either complaint. The engine and transmission vehicle always operated within standard specifications for the vehicle.

19

Clark's expert witness reported a vibration and delay in shifting that Clark had previously identified, but was unable to record either on video. He had no knowledge of the parameters within which the engine and transmission were designed to operate, opining only that they did not operate as he would expect. BMW's witnesses described the difference between the transmission of the vehicle and Clark's previous vehicles, explaining that there were instances in which a delay in shifting might be felt, but that the delay was within specifications for the vehicle. The evidence overwhelmingly supports the conclusion that the dealership promptly repaired all verifiable defects in the vehicle when Clark presented the vehicle to the dealership for service of the specific defect. Under this set of facts, it does not seem probable that the jury would have found that the dealership refused or failed to repair a defect within a reasonable time. The instructional error was nonprejudicial.

**DISPOSITION**

The judgment is affirmed. BMW is awarded its costs on appeal.

KRIEGLER, J.

We concur:

TURNER, P. J.                    MINK, J.[*]

---

[*] Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.